1   Bruce Isaacs, Esq. (SB# 100926), bisaacs@wymanisaacs.com
2   WYMAN & ISAACS LLP
    5757 Wilshire Blvd., Suite 475
3   Los Angeles, CA  90036
    Tel:  (323) 648-4141
4   Fax:  (323) 648-4133

5   Attorneys for Intervenor
    INCENTIVE CAPITAL, LLC
6

7

8
                       **UNITED STATES DISTRICT COURT**
9
                       **CENTRAL DISTRICT OF CALIFORNIA**
10

11

12  CAMELOT DISTRIBUTION GROUP, INC.,  )   Case No.:  CV11-01949 DDP (FMOx)
                                        )
13                        Plaintiff,    )   **NOTICE OF MOTION AND MOTION TO**
            vs.                         )   **INTERVENE; MEMORANDUM OF**
14                                      )   **POINTS AND AUTHORITIES IN**
    DOES 1 through 5865, inclusive,     )   **SUPPORT THEREOF**
15                                      )
                          Defendant.    )   Date:        June 13, 2011
16                                      )   Time:        10:00 a.m.
    _____)   Courtroom:  "3"
17

18                                          (Filed Currently with Declaration of Joseph G.
                                            Pia and [Proposed] Complaint in Intervention
19                                          for Copyright Infringement; and [Proposed]
                                            Order)
20

21

22

23

24

25

26

27

28

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

**PLEASE TAKE NOTICE** that on June 13, 2011, at 10:00 a.m., in Courtroom "3" of the United States District Court for the Central District of California, located at 312 N. Spring Street, Los Angeles, CA 90012, Intervenor Incentive Capital, LLC, a Utah Limited Liability Company ("Incentive") will, and hereby does, move this Court to intervene, as a matter of right and/or permissively, in the copyright action filed by Camelot Distribution Group, Inc. ("Camelot") with respect to the motion picture entitled *"Nude Nuns with Big Guns"* (the "Motion Picture") pursuant to Rule 24 of the Federal Rules of Civil Procedure.

The motion is based on the grounds that Incentive Capital, not Camelot, is the owner of the distribution rights to the Motion Picture by virtue of a non-judicial foreclosure which took place on or about February 11, 2011, before Camelot filed its copyright infringement action with respect to the Motion Picture.

This motion is based upon this notice, the memorandum of points and authorities in support thereof, the Declaration of Joseph Pia and the exhibits attached hereto, any reply papers, all pleadings and papers on file with the Court in this action, such matters of which this Court may take judicial notice and such oral and documentary evidence as may be presented at the time of hearing.

Dated: May 5, 2011

                    WYMAN & ISAACS LLP

                    By: /s/ Bruce Isaacs, Esq.

                    Attorneys for Defendant Incentive Capital,   LLC

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiff Camelot Distribution Group, Inc. ("Camelot") has no rights to distribute or otherwise exploit the motion picture titled *Nude Nuns With Big Guns* ("Motion Picture") as it claims in its complaint commencing this action.  Plaintiff-Intervenor Incentive Capital, LLC ("Incentive") foreclosed Camelot's interests in the Motion Picture before this suit was filed, and therefore is the rightful party in interest to bring this suit.

## BACKGROUND

Camelot is a Nevada corporation that does business in California.  It is closely associated with two other corporations also doing business in California: Camelot Entertain Group, Inc. ("CEG")[1] and Camelot Film Group, Inc. ("CFG") (collectively the "Camelot Parties").

Freak Show Entertainment ("FSE") produced the Motion Picture, which was released in 2010. On September 22, 2009, FSE granted Camelot "the sole and exclusive rights to market, promote, advertise, distribute, and otherwise exploit the [Motion] Picture in all forms of distribution and in all media known ... [including over the] internet," which was defined to include "transmission[s] over what is commonly known as the World Wide Web" ("the Exclusive License").  *See* Deal Memo (attached as **Exhibit A** and incorporated herein by reference) at § 3.  The Exclusive License precluded any distribution of the Motion Picture by any person or entity, including FSE, without consent of Camelot. *See* Deal Memo at § 12 (FSE warranted that it "has not made or attempted to make and will not make any grant or assignments which will or might derogate, compete with, conflict with or impair the *complete enjoyment* of the rights and privileges granted to [Camelot]").  The Deal Memo also allowed Camelot to assign the Exclusive License or delegate the obligations of the Exclusive License as it deemed necessary. *Id.* at § 19.  For distribution of the Motion Picture, Camelot would collect a distribution fee of 20% of gross receipts. *Id.* at § 7.  In addition, FSE granted to Camelot "a beneficial interest in and to the exclusive right to collect ... all royalties, fees and other revenues" which FSE was entitled to collect for

---

[1]    Although Camelot is named as Plaintiff in the caption of the complaint, "Camelot Entertainment Group, Inc." is later referred to as the party to this action.  The change in name simply reflects how closely tied these companies are.  But Regardless of the name used, as is shown in this memorandum, Incentive has foreclosed the rights of all three corporations and currently has sole distributor rights.

1    "any use of the [Motion] Picture pursuant to any exercise" of the rights granted under the Exclusive

2    License. *Id.* at § 8.

3          On April 27, 2010, CFG borrowed $650,000 from Incentive under a Promissory Note ("the

4    Note"). A copy of the Note is attached as **Exhibit B** and incorporated herein by reference. The Note was

5    secured and guaranteed through a series of security agreements and commercial guarantees, all of which

6    were executed on the same day as the Note. Camelot executed a Security Agreement whereby it granted

7    Incentive a security interest in "all [Camelot's] rights" to various films and film titles, including the

8    Motion Picture, to secure the Note. A copy of the Camelot security agreement is attached as **Exhibit C**

9    and incorporated herein by reference. This included the Exclusive License. In addition, CFG executed a

10   Security and Participation Agreement whereby it granted Incentive a security interest in its interests in

11   various films and film titles, including the Motion Picture, to secure the Note. A copy of CFG's Security

12   and Participation Agreement is attached as **Exhibit D** and incorporated herein by reference. Camelot and

13   CEG also provided commercial guarantees to guarantee payment on the Note, and which guarantees are

14   attached respectively as **Exhibits E and F** and incorporated herein by reference.

15         Pursuant to the terms of the Note, the principal amount of $650,000, fees of approximately

16   $32,500, and applicable interest and costs were due on or before January 31, 2011. *See* Exhibit A.

17   Incentive was also to receive a percentage of revenues derived from CFG's exploitation and distribution

18   of the films that secured the Note. *See id.* Terms of the Note were modified on June 11, 2010 by a Loan

19   Modification Agreement, but payment of the loan remained secured by the Camelot Parties' interests in

20   the various films and film titles identified in the security agreements, including the Exclusive License. A

21   copy of the Loan Modification Agreement is attached hereto as **Exhibit G** and incorporated herein by

22   reference.

23         The Camelot Parties' all breached their obligations under the Note and the various security

24   agreements and commercial guarantees by, among other things, failing to pay off the loan amount due

25   under the Note by January 31, 2011. Because of these breaches, Incentive non-judicially foreclosed[2] on

26

27   ───────────────
     [2]      The foreclosure is valid under Utah law, the law governing the contractual relationships between Incentive and the
28   Camelot Parties.

1  its security interests in the Camelot Parties' various films and film titles listed in the security agreements,

2  including the Exclusive License in the Motion Picture.  After proper notice, Incentive held a public

3  auction of the Camelot Parties' interests in the film and film titles, including the Exclusive License, on

4  February 21, 2011.  A copy of a Transfer Statement detailing the public sale is attached hereto as **Exhibit**

5  **H** and incorporated herein by reference.  Incentive was the successful bidder at the sale and took

6  possession of all the interests in the films and film titles, including the Exclusive License in the Motion

7  Picture, of the Camelot Parties.  Thus as of February 21, 2011, Incentive was the rightful owner of the

8  Exclusive License in the Motion Picture.

9  **ARGUMENT**

10      As owner of the Exclusive License in the Motion Picture, Incentive is the proper party to enforce

11  any copyright infringement of the Motion Picture and seeks intervention under Rule 24 of the Federal

12  Rules of Civil Procedure.  Under 17 U.S.C. § 501(b), the legal or beneficial owners of an exclusive right

13  under a copyright is entitled to sue for infringement of that right, and demands the intervention of such

14  owners in lawsuits to enforce those legal rights.  Moreover, Rule 24 permits a party to intervene as of

15  right or permissively.  *See* Fed. R. Civ. P. 24 (a) & (b).  Incentive satisfies requirements to intervene in

16  both circumstances and should thus be allowed to intervene by the Court.

17

18  **I.**    **Incentive has an Unconditional Statutory Right to Intervene**

19      First, Incentive meets the requirements under Rule 24(a)(1) to intervene as of right because it has

20  an "unconditional right to intervene by a federal statute."  Incentive claims that it – not Camelot – is the

21  exclusive licensee of the copyright interests in the Motion Picture by virtue of its foreclosure sale and

22  subsequent purchase of those rights.  Under 17 U.S.C. § 501(b), "[t]he legal or beneficial owner of an

23  exclusive right under a copyright is entitled … to institute an action for any infringement of that particular

24  right."  Moreover, a court "shall permit the intervention of any person having or claiming an interest in

25  the copyright."  *Id.*; *see also Silver v. Sony Pictures Entertainment, Inc.*, 402 F.3d 881, 884 (9th Cir.

26  2005).  Based on the foreclosure of Camelot's Exclusive License, Camelot may not institute this lawsuit.

27

28

1    This is an independent legal basis for intervention, *see Vestron, Inc. v. Home Box Office, Inc.*, 1987 WL

2    123012, *1 (C.D. Cal.), and the Court must allow Incentive to intervene under this statute.

3

4    **II.     Incentive Meets the Requirements Under Rule 24 to Intervene as of Right.**

5             Further, Incentive meets the requirements under Rule 24(a)(2) to intervene as of right.

6    Intervention in this fashion requires a party satisfy a four-part test:

7             1) the application must be timely; 2) the applicant must have a 'significantly protectable'
              interest relating to the property or transaction that is the subject of the action; 3) the
8             applicant must be so situated that the disposition of the action may, as a practical matter,
              impair or impede the applicant's ability to protect that interest; and 4) the applicant's
9             interest must not be adequately represented by the existing parties in the lawsuit.

10   *See Mattel, Inc. v. Bryant*, 441 F.Supp.2d 1081, 1094-95 (C.D. Cal. 2005) (*citing* Fed. R. Civ. P.

11   24(a); *Northwest Forest Res. Council v. Glickman*, 82 F.3d 825, 836 (9th Cir. 1996)).  Courts

12   generally construe the factors outline in Rule 24(a) "liberally in favor of potential intervenors …

13   [being] guided primarily by practical considerations, not technical distinctions." *Mattel*, 441

14   F.Supp.2d at 1095 (*quoting Southwest Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 818

15   (9th Cir. 2001).  If an applicant meets the requirements of Rule 24(a), the Court "must permit"

16   that party to intervene, *id.*, whereupon the intervenor will be given "full party status, including

17   the right to engage in discovery, to participate at trial, and to appeal the judgment." *California*

18   *Hosp. Ass'n v. Maxwell-Jolley*, 2009 WL 4120725, * 1 (C.D. Cal. Nov. 23, 2009).

19             A.     Incentive's Application to Intervene is Timely.

20             There can be little question that Incentive's application to intervene is timely.  When

21   considering the timeliness of a motion to intervene, the Court considers "the stage of the

22   proceedings, the prejudice to existing parties, and the length of and reason for delay." *Id.* at * 2.

23   First, this case is still at its earliest stages.  The only substantive pleadings and documents that

24   have been filed are a complaint and a motion for expedited discovery (which was denied by the

25   Court). *See* Dkt. Nos. 1, 5, & 10.

26             Second, there has been no delay.  The case was filed on March 7, 2011, meaning

27   Incentive's current motion was filed less than 45 days after the commencement of the case.  To

28

1   the extent the Court considers such time a delay, the reason for the delay was that Incentive,

2   being a Utah company, was not aware that a lawsuit had been filed to enforce copyrights on its

3   films until only a few days ago.  Once it learned of the suit, Incentive hastily filed this motion to

4   intervene.

5        Finally, there will be no prejudice to Camelot in allowing Incentive to intervene.  On the

6   contrary, this suit cannot be prosecuted without Incentive.  Camelot is no longer the owner or

7   beneficial owner of the Exclusive License and therefore lacks standing to enforce the Motion

8   Picture's copyright.  Incentive, as the current owner of the Exclusive License, is the only party

9   that can seek to enforce the copyright, and thus Incentive must be involved in this lawsuit.

10  Based on a lack of delay and prejudice, Incentive's motion is timely.

11       B.    Incentive has a Significantly Protectable Interest in the Motion Picture.

12       A party "has a significant protectable interest in an action if (1) it asserts an interest that

13  is protected under some law, and (2) there is a relationship between its legally protected interest

14  and the plaintiff's claims." *Donnelly v. Glickman,* 159 F.3d 405, 409 (9th Cir.1998).  Copyright

15  interests in a work are significantly protectable interests that require intervention.  17 U.S.C. §

16  501(b) clearly requires that a court "shall permit the intervention[] of any person having or

17  claiming an interest in the copyright." *See also Fahmy v. Jay-Z,* 261 F.R.D. 180, 185 (C.D. Cal.

18  2009).

19       Incentive has asserted through this motion that it – not Camelot – is the owner of the

20  Exclusive License in the Motion Picture, with all rights, title and interests in its distribution and

21  copyright.  Copyright interests are protected under the law.  Incentive's Exclusive License in the

22  Motion Picture are directly related to Camelot's claims as an exclusive licensee for the Motion

23  Picture.  Thus Incentive has a significantly protectable interest in the Motion Picture.

24       C.    Incentive Will Not Be Able to Protect Its Interest in the Motion Picture if it is Not

25             Allowed to Intervene.

26       "[D]etermining whether disposition of the action will impede or impair the movant's

27  ability to protect its interest the question must be put in practical terms rather than in legal terms.

28

1    Wright & Miller FPP § 1908.2, 7C Fed. Prac. & Proc. Civ. § 1908.2 (3d ed.).  Thus this

2    requirements is satisfied when "disposition of the present action would put the movant at a

3    practical disadvantage in protecting its interest." *Id.*

4        If Incentive is not allowed to intervene, it will not be able to protect its Exclusive License

5    in the Motion Picture.  Incentive is now the exclusive licensee of the copyright in the Motion

6    Picture and has exclusive distribution rights, as well as a right to any distribution fees or other

7    royalties, fees or revenues resulting from exploitation of the Motion Picture.  In a similar suit, the

8    Court found that an applicant for intervention claiming a copyright and distribution interest in a

9    film would not be able to protect that interest if not allowed to intervene. *See Vestron*, 1987 WL

10   123012 at *2.  Applying the words of the court there, "[w]ithout intervention, [Incentive's]

11   interest may be impaired since its profit share may be impacted by the manner in which the

12   [Motion Picture is] ultimately distributed." *Id.*  Intervention is thus necessary to enable Incentive

13   to adequately protect its Exclusive License in the Motion Picture.

14       D.    Incentive's Interests in the Motion Picture are Not Adequately Represented by

15             Camelot.

16       It must first be noted that an applicant's burden in showing that its interests may not be

17   adequately represented by the existing parties "should be viewed as minimal." *Mattel*, 441

18   F.Supp.2d at 1095 (*quoting* 16 James Wm. Moore et al., *Moore's Federal Practice* §

19   24.03[4][a][i] (3d ed.2004).  Notwithstanding this di minimus burden, Incentive's interests in the

20   Motion Picture can clearly not be adequately represented by Camelot.  Camelot has *no interest* in

21   the Motion Picture now that Incentive has foreclosed that interest.  Thus Camelot is not a proper

22   party to have brought this suit in the first instance.  Because Camelot has questionable standing

23   to begin with, there is no one in this case who can adequately protect Incentive's interests.

24       As the owner of all right, title and interest in the Motion Picture, Incentive has met all the

25   requirements under Rule 24(a) for intervention as of right.  Under the rule, the Court must

26   therefore permit Incentive to intervene in this action and become a party to this lawsuit.

27

28

**III.    Incentive Meets the Requirements under Rule 24(b) for Permissive Intervention.**

If the Court determines that Incentive does not meet the requirements under Rule 24(a) to intervene as of right, the Court may still permit Incentive to permissively intervene under Rule 24(b).  Permissive intervention requires 1) independent grounds for the applicant's intervention; 2) a timely motion, and 3) that the applicant's claim or defense has a question of law or fact in common with the main action.  *See Fahmy*, 261 F.R.D. at 184.  Incentive has independent grounds for an action and a common question of law or fact.[3]

Incentive is the exclusive licensee of the copyright in the Motion Picture, and therefore has the exclusive right to bring claims for copyright infringement under the Copyright Act.  Copyright infringement claims establish federal question jurisdiction, *see Andreas Carlsson Productions, AB v. Barnes*, 2011 WL 744911 (C.D. Cal.), and would support the Court's jurisdiction over Incentives' copyright infringement claims.

Moreover, the factual bases for any copyright infringement claim of Incentive is identical to the purported claims of Camelot.

<u>**CONCLUSION**</u>

Based on the arguments above, Incentive has a right to intervention on three separate bases.  First, it has an unconditional right under 17 U.S.C. § 501(b) to intervene and enforce its Exclusive License in the Motion Picture and should be allowed to intervene under Rule 24(a)(1).  Second, for similar reasons, it must be permitted to intervene as of right under Rule 24(a)(2).  And finally, Incentive may be permitted to permissively intervene under Rule 24(b)(1).  For all the reasons, each one an independent basis to permit or require intervention, the Court should grant Incentive's motion and permit it to intervene in this action.

---

[3]    Because timeliness is analyzed under the same constraints as for intervention as of right, a timely motion under Rule 24(a)(2) will also be timely under Rule 24(b)(1).

1    DATED this 5th day of May, 2011.

2                                        WYMAN & ISAACS LLP

3

4                                        By: /s/ Bruce Isaacs, Esq.
                                         Attorneys for Intervenor Incentive Capital, LLC

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT  A**

## CAMELOT DISTRIBUTION GROUP, INC.
## DEAL MEMO

This Deal Memo will confirm the agreement ("Agreement"), made as of September 22, 2009, between Freak Show Entertainment, located at 7917 Santa Paula Street Highland CA 92346 ("Licensor") and Camelot Distribution Group, Inc., a division of Camelot Entertainment Group, Inc., a Delaware corporation, located at 10 Universal City Plaza 20th Floor, Universal City, CA 91608 Tel: (818) 308-8858 ("Distributor"), as of the above date with regards to the distribution of the production currently entitled

### "NUDE NUNS WITH BIG GUNS" (the "Picture").

Licensor and Distributor hereby agree to the following:

1.      **TERRITORY**:  The licensed territory shall be the entire world ("Territory").

2.      **TERM:**

Agreement will commence as of the date hereof and continue for a period of Seven (7) years from the later of full execution of this Agreement or delivery of the Picture  (the "Term"), which shall be automatically extended for additional one (1) year periods, unless one of the parties gives the other party thirty (30) days written notice of termination prior to the expiration of any one (1) year period.  provided, however, that Distributor shall have a right of first negotiation/last refusal to extend the Term on terms to be negotiated in good faith between the parties.  Licensor agrees to fulfill the terms and conditions of all license agreements entered into by Distributor with respect to the Picture during the Term. Distributor shall have the right (i) to enter into license agreements for the Picture for a period of time that extends beyond the Term, but in no event longer than fifteen (15) years from the end of the Term and any extensions thereof as permitted hereunder, and (ii)  to authorize sub-distributors to sell off home video inventory of the Picture for a period of six (6) months from the expiration of the Term, or the term of any license agreement, whichever is longer [unless a sub-distributor requires a longer sell-off period for home videos of the Picture, in which event Distributor will advise Licensor in writing, and said sell-off period shall be extended for up to an additional six (6) months].

3.      **RIGHTS:**

Licensor hereby grants and assigns to Distributor for the Term, as it may be extended hereunder, and in the Territory, the sole and exclusive rights to market, promote, advertise, distribute, and otherwise exploit the Picture in all forms of distribution and in all media now known or hereafter invented, ,  all means of theatrical, non-theatrical, videocassette, DVD and or videodisc (including home and public use as well as by means of television including broadcast, cable, pay-cable, pay per view, subscription, HDTV, SATV, Internet and closed circuit) or by any process analogous thereto, whether now known or hereafter developed, VOD, internet (including, without limitation, webisodes), ("Distribution Rights"), and authorize third parties to so market, promote, advertise, distribute and otherwise exploit the Picture.  "Internet" shall mean exhibition, broadcast, or transmission over what is commonly known as the World Wide Web, by any means, in such a manner as to permit the viewing of the complete Picture without alteration of the original continuity of, or sequence of images comprising the Picture. Internet exploitation shall be limited to transmission within the Territory to intermediate or ultimate users in each applicable territory within the Territory where the Picture is licensed by technical means which prohibit access (either directly or indirectly) to any person outside that particular territory within the Territory.

The rights to promote and advertise the Picture will include, but not be limited to, the right to use the name of the producer of the Picture and the name, biography and likeness of the performers and other individuals who rendered services in or in connection with the production of the Picture; provided, however, that there shall be no direct or indirect endorsement of any product by Licensor unless approved in writing by Licensor.

Distributor's rights include the right to enter into license agreements that extend beyond the end of the Term, as stated above. Licensor additionally grants to Distributor the right to change the title of the Picture in its sole discretion and Distributor shall only be allowed to cut, edit, dub, subtitle and alter the Picture or any parts thereof, and to authorize others to do so, only for market requirements, timing and censorship purposes, subject to Licensor's right to consult with Distributor, provided, however, that it is understood that Distributor shall have final approval in its sole discretion. Notwithstanding the foregoing, Distributor cannot edit the credits without Licensor's approval, which shall not be unreasonably withheld. Distributor shall have all normal and customary rights of distributors for the Picture in the Territory, including, without limitation, the unqualified control of the distribution, exploitation and other disposition of the Picture directly or by any subsidiary, affiliate, sub-distributor, or any other party, in accordance with such terms and conditions, including, but not limited to, the applicable fee structure and revenue sharing, as Distributor in its sole discretion may determine for each Territory, and a right of first negotiation/last refusal on the distribution rights to each prequel and sequel, if any, to the Picture, but excluding merchandising, format and music publishing, rights (collectively with the Distribution Rights, the "Rights").

4.    **GROSS RECEIPTS DEFINED:**

Subject to paragraph 6 below, "Gross Receipts" (as defined and used herein), shall mean the aggregate of all non-returnable monies (but not reimbursements for expenses) actually received by Distributor or for the account of Distributor or credited or applied to the benefit of Distributor as consideration pursuant to licensing and/or otherwise exploiting the Rights during the Term, as it may be extended hereunder, including all such amounts payable or received pursuant to licenses or agreements negotiated or ~~entered into during the Term hereof, as it may be extended hereunder, whether payable or~~ received during or after such Term, as it may be extended hereunder. Gross Receipts shall exclude, without limitation, the share of monies that Distributor's sub-Distributors retain as compensation/fees for their services and recoupment of expenses.

5.    **ADVANCE:**

Distributor shall provide Licensor an advance against sales of Ten Thousand Dollars US (US$10,000.00) (referred to as the "Advance"). This Advance will be paid as follows: Fifty Percent (50%) (e.g., $5000.00) due no later than fifteen (15) days from full execution of the Agreement, Two Thousand Five Hundred Dollars ($2500.00) upon completion of production and the balance of Two Thousand Five Hundred Dollars ($2500.00) will be due upon Distributor's final acceptance of all elements of the completed Picture, including, without limitation, all of the deliverables requested by Distributor.

6.    **EXPENSES:**

Distributor shall have the right to deduct from Gross Receipts (as defined above) a one-time, flat market fee of Twenty Thousand Dollars ($20,000.00) (collectively the "Market Fee"). The Market fee will be used for, but not be limited to, the cost of market attendance, exploitation, advertising, marketing, shipping, and duplication of screeners of

the Picture for the length of the Term, but excluding the costs identified in Paragraph 7 (B) (iii) and (v) below.

7.    **DISTRIBUTION FEES AND LICENSOR'S SHARE:**

A)    Distributor's Distribution Fee shall be Twenty Percent (20%) of Gross Receipts.

B)    Gross Receipts shall be allocated and paid as follows:

(i)    first to Distributor: in the amount of the applicable Distribution Fee;

(ii)    second to Distributor: recoupment of the Advance

(iii)    third to Distributor: the $20,000 Market Fee;

(iv)    fourth to Distributor: the cost of the trailer and key art for the Picture;

(v)    fifth to Distributor: reimbursement for the amount of any E & O insurance costs incurred by Distributor pursuant to Paragraph 18 hereof and

(vi)    sixth to Licensor: the remaining balance of Gross Receipts after deducting (i), (ii) (iii) (iv) and (v) above ("Licensor's Share of Gross Receipts").

8.    **COPYRIGHT REVENUES:**

Licensor grants and licenses to Distributor a beneficial interest in and to the exclusive right to collect, throughout the Territory during the Term, as it may be extended hereunder, all royalties, fees and other revenues which Licensor, or the registered copyright owner, is otherwise entitled to collect by reason of any statute, governmental regulation, operation of law or in any other manner, for, based upon or in connection with, in whole or in part, or directly or indirectly, any use of the Picture pursuant to any exercise of the Rights granted hereunder, including, but not limited to, the recording and/or retransmission of the signal embodying the Picture ("Copyright Revenues"). All Copyright Revenues derived by Distributor shall be included in Gross Receipts.

9.    **ACCOUNTING/AUDITING:**

Distributor shall provide Licensor with accounting statements in respect of the Picture, commencing with the first full quarter following the quarter in which Gross Receipts are first received or expenses are incurred by Distributor. Such accounting statements will be sent to Distributor with the applicable payments by a third party Account Collection Management Company to be selected by Distributor in consultation with the Licensor no later than October 31, 2009, if any, no more than sixty (60) days after the end of each such calander quarter during the Term, as it may be extended hereunder. Distributor shall keep true and accurate books of account with respect to the Picture at its principal place of business in Los Angeles, California. Licensor shall have the right to audit Distributor's books pertaining to the Picture by a certified public accountant experienced in the entertainment industry not more frequently than once in any one year, upon thirty days prior written notice to Distributor. Each audit shall be conducted at Distributor's principal place of business during normal business hours. Distributor shall provide copies of all Territory deals entered into in relation to the Picture at the end of the Term, as it may be extended hereunder.   Distributor shall provide copies of all territorial deals entered into in relation to the Picture no more than 60 days after the end of the calander quarter, accompanying the statement, during the term.

10.    **DELIVERY:**

As a condition precedent to the payment of any monies which may become due and payable under this Agreement. Licensor agrees that it shall make "Complete Delivery" of the Picture and the applicable deliverables to Distributor as delineated in Schedule "A" (which is attached hereto and by reference hereof made a part of this Agreement) no later than November 15. 2009 (the "Delivery Date"), unless the Delivery Date is changed by mutual agreement between the parties hereto. "Complete Delivery" shall mean complete and technically-acceptable delivery of the Picture by Licensor to Distributor, and acceptance thereof in writing by Distributor, provided that, for any original film or video master materials, Distributor shall be given a lab access letter in a form acceptable to Distributor, if applicable. Distributor shall have the right to inspect and examine all Delivery Items. documentation and publicity and advertising materials tendered as Delivery hereunder and shall advise Licensor if and wherein the same is not complete. whereupon Licensor shall promptly deliver to Distributor the items of which it failed to make Delivery. Acceptance by Distributor of less than all the items required for Delivery and/or release of the Picture prior to Delivery of all items required shall in no event be construed to be a waiver by Distributor of Licensor's obligation to deliver any item not initially delivered hereunder.

11.    **CREDITS:**

Distributor shall be entitled to add a company credit(s) and logo(s) to the beginning of the Picture within the Territory. Distributor shall also be entitled to add a minimum of two (2) executive producer credits. All credits shall appear in all media in no less favorable positions than those credits granted to other companies and producers, including, but not limited to. executive producers and producers. of the Picture.

12.    **WARRANTIES:**

(a)   Licensor warrants and represents that it owns and controls the exclusive right, title and interest in and to all  rights. licenses. & privileges herein granted to Distributor and is free to enter into this Agreement. that Licensor is not subject to any obligation or disability which will or might hinder or prevent the full completion and performance by Licensor of any of the agreements, covenants or conditions to be kept or performed by Licensor hereunder. that Licensor has not made or attempted to make and will not make any grant or assignments which will or might derogate, compete with, conflict with or impair the complete enjoyment of the rights and privileges granted to Distributor hereunder; and that the Picture is not and shall not be subject to any lien, encumbrance or security interest during the Term of this Agreement, as it may be extended hereunder. and that it is empowered to enter into this Agreement with Distributor and to grant to the Rights.

(b)   Licensor owns or controls. or will own and control all necessary rights in and to all previously copyrighted music and other music and lyrics synchronized with the Picture. including. without limitation, good and valid synchronization and performance licenses in customary form executed by each copyright proprietor or other owner of such music and/or lyrics or such proprietor's agent or trustee, together with the non-exclusive and irrevocable right to perform publicly for profit or otherwise. and to authorize others so to perform, said music and/or lyrics in the exhibition of the Picture in any and all media. as well as in trailers and other advertising and publicity exhibited or issued in connection with the Picture, which performance rights are subjected only to the rights. if any. of so-called "performing rights societies" in the Licensed Territory.

(c)   That all licenses. compensation, royalties and other payments which have been or

may hereafter be payable to any person, union, guild, trust fund or governmental authority
for or on account of or in connection with the financing, production, photography,
recording, synchronization, reproduction, distribution, exhibition and /or performance of
the Picture in any part or element whereof have been paid or will be paid in full by
Licensor, that Distributor will incur no obligations based on retroactive increases of any of
such obligations, and that, without limiting the generality of the foregoing, Licensor has
paid or will pay all monies which may be required to be paid under applicable personnel
by reason of all forms of exhibition and/or exploitation of the Picture hereunder.

   (d) That, to the best of Licensor's knowledge, the distribution, use and other
exploitation of the Picture hereunder including, without limitation, all visual and aural
elements thereof, and the exercise of the rights, licenses and privileges herein granted to
Distributor will in no way infringe upon or violate the copyright or common law or legal
rights or the literary, dramatic, motion Picture, television or other rights of any person or
entity whatsoever; or, to the best of Licensor's knowledge, constitute a libel or defamation
of, or invasion of the rights of privacy or publicity of, or infringe upon the trademark,
trade name or patent of, any person or entity whatsoever, or violate any federal, state,
local or other laws, rules or regulations (including, without limitation, the provisions of
the Federal Communications Act of 1934 and/or any applicable collective bargaining
agreement(s) whatsoever);

   (e) That there are no claims or litigation pending or threatened which might
adversely affect any of the rights, licenses or privileges granted to Distributor hereunder;
and that Licensor will promptly advise Distributor of any such litigation, claims or threats
of which Licensor hereafter acquires knowledge;

   (f) That, if any person rendering services in or in connection with the Picture or
furnishing materials or rights therefore is entitled to participate in the revenues derived
from the Picture, whether measured by net profits, gross revenues or otherwise, such
participation(s) shall be paid solely by Licensor and that no such person shall have any
right to any payment or accounting from Distributor, except copies of signed sales
contracts.

   (g)  That all performers, producers, directors, writers, authors, musicians, composers,
music publishers and other persons who or whose names, voices, photographs, likenesses,
works, compositions, services or material appear in or were rendered or furnished in
connection with the Picture have granted, released and authorized, or will grant, release
and authorize prior to completion of services, same for use in the Picture and the
advertising, publicity and promotion thereof, in accordance with this Agreement. The
credit lists and other elements delivered to Distributor hereunder will be complete and
accurate, and Distributor will not incur any liabilities to any third parties arising out of its
material compliance with such lists and use thereof. Distributor shall comply with any
restrictions on the use of the name or likeness of any persons rendering services in
connection with the Picture, provided Distributor is given written notice of such
restrictions prior to Distributor's exploitations of the Rights (but in no event later than
Delivery of the Picture to Distributor) and provided such restrictions are customary for
such person in light of such person's stature and the nature of his or her engagement.

   (h) That Licensor shall include in the end titles of the Picture as delivered to
Distributor a copyright notice in conformity with the laws of the United States, the
Universal Copyright Convention, or any other applicable statute, act or treaty,
designating Licensor as copyright proprietor. Licensor represents and warrants that the
Picture will not be in (and will not fall into) the public domain in the Territory and will
be validly copyrighted within each country of the Territory. If Licensor does not, within
a reasonable time after written request therefore by Distributor register the copyright in
the Picture, in addition to Licensor being in breach of this Agreement, Distributor is

authorized (but not obligated) to take such steps as it may deem advisable to register copyright and protect Distributor's rights in the Picture anywhere in the Territory (including without limitation the United States). any costs incurred by Distributor's registrations of the Picture shall be considered a Distribution Expense and for such purpose only, Distributor is irrevocably appointed the attorney-in-fact of Licensor, such appointment being coupled with an interest.

(i) Distributor represents and warrants that it has the right to enter into and perform all of its obligations hereunder. and shall perform all of its obligations hereunder to the best of its ability, it being understood that Distributor makes no guarantees whatsoever on securing any agreements for particular media or deriving/earning revenue from the distribution of the Picture as approved hereunder.

14.    **INDEMNIFICATION**:

Licensor shall indemnify, defend and hold harmless Distributor, and its parent, subsidiaries, affiliates, constituent corporations, and its and their respective employees, officers, shareholders, directors, agents, Distributors, successors and assigns. from and against any and all liability, claims, costs. damages and expenses (including legal costs and reasonable attorneys' fees whether or not in connection with litigation) arising out of or in connection with a breach or alleged breach by Licensor of any warranties, representations or agreements contained in this Deal Memo. Distributor agrees to indemnify, defend, and hold harmless Licensor from and against any and all third party claims arising out of Distributor's exploitation of the Picture, unless such claims arise out of a breach or alleged breach of any of Licensor's representations. warranties and/or contractual obligations hereunder. Licensor hereby expressly understands, acknowledges and agrees that Distributor has not made and does not make any representation or warranty with respect to the amount of the license fees or other amounts which will or may be earned from the exploitation of the Picture.

15.    **NOTICES**:

All such notices shall be personally delivered, sent by fax with electronic confirmation of receipt and mailing of a second copy as stated below, sent by electronic mail (email) or deposited in the U.S. Mail, certified return receipt requested, postage prepaid and shall be deemed received when personally delivered or faxed as aforesaid. or if by mail or email. written confirmation by Licensor that they have received such notice via U.S. Mail or email as aforesaid. All such Notices shall be mailed to the addresses first listed above.

16.    **RESIDUALS**:

Licensor is solely responsible for any and all third party obligations, participations, deferrals, and residuals (including but not limited to SAG. WGA, DGA, and/or any other guild/unions on the production of the Picture) in connection with the Picture.

17.    **LABORATORY ACCESS**:

Licensor agrees to sign appropriate customary and necessary laboratory access letters allowing Distributor to pre-print and video elements, if any.

18.    **INSURANCE**:

If Licensor shall decide to obtain E & O insurance for the Picture. then Distributor, its officers, employees, sub-licensees, sub-distributors, and its designees shall be included as additional insureds on such an E & O insurance policy. If Licensor does not obtain E&O when it is required by a qualified North American broadcaster, Distributor shall



have the right, but not the obligation to advance the necessary funds to secure an E&O policy for the Picture. Such an expenditure shall not count against any distribution expense cap.

19.    **ASSIGNMENT:**

Licensor shall not have the right to assign this Agreement prior to Complete Delivery of the Picture. Distributor may assign this Agreement and delegate the obligations hereunder to and/or may distribute the Picture as deemed necessary by the Distributor, including through any of its subsidiaries, parents, or affiliated corporations of Distributor. Any other assignments of rights or delegation of obligations hereunder, shall not relieve Licensee of its obligations and liabilities stated herein, unless such assignment or delegation is accepted in writing by Licensor.

20.    **TERMINATION:**

No failure by either party hereto to perform any of its obligations under this Agreement shall be deemed to be a material breach of this Agreement until the non-breaching party has given the breaching party written notice of its failure to perform and such failure has not been corrected within thirty (30) business days from and after the giving of such written notice. In the event of an uncured material breach, either party shall be entitled to terminate this Agreement by written notice to the other party, seek to btain monetary damages, if any, and any other appropriate relief, including, without limitation, the right for Licensor to regain all of its rights in the Picture subject to existing executory contracts and licenses respecting the Picture on which Distributor will still receive any revenues as set forth herein; provided, however, that any dispute or controversy hereunder that remains uncured shall be resolved pursuant to the arbitraiton procedures set forth below.

21..   **OTHER:**

If a "Force Majeure" event occurs (as such term is commonly understood in the entertainment industry) the Term hereof shall be extended by the actual period during which such Force Majeure event continues, but not more than eight (8) weeks.

22.    **GOVERNING LAW AND JURISDICTION:**

This agreement shall be governed by and construed in accordance with the laws of the State of California for contracts entered into and performed therein. No change or modification hereof shall be binding upon either party hereto unless in writing and signed by both parties. Any controversy or claim arising out of or in relation to this Agreement or the validity, construction or performance of this Agreement, or the breach thereof, shall be resolved by arbitration in accordance with the rules and procedures of IFTA in Los Angeles, California, as said rules may be amended from time to time with rights of discovery if requested by the arbitrator. Such rules and procedures are incorporated and made a part of this Agreement by reference. If IFTA shall refuse to accept jurisdiction of such dispute, then the parties agree to arbitrate such matter before and in accordance with the rules of the American Arbitration Association under its jurisdiction in Los Angeles, California before a single arbitrator familiar with entertainment law. The parties shall have the right to engage in pre-hearing discovery in connection with such arbitration proceedings. The parties agree hereto that they will abide by and perform any award rendered in any arbitration conducted pursuant hereto, that any court having jurisdiction thereof may issue a judgment based upon such award and that the prevailing party in such arbitration and/or confirmation proceeding shall be entitled to recover its reasonable attorneys' fees and expenses. The arbitration shall be final, binding and non-appealable. The arbitration will be held in Los Angeles, California

and any award shall be final, binding and non-appealable. The Parties agree to accept service of process in accordance with IFTA Rules.

23.    **COUNTERPARTS:**

This Agreement may be executed in two or more counterparts, including counterparts signed via receipt by facsimile transmissions, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Subject only to the specific terms hereof, this Agreement shall be deemed to include all of the standard terms applicable to entertainment agreements of this nature, including, without limitation, force majeure, and default clauses. The parties may enter into a more formal agreement incorporating the terms and conditions hereof, and the parties shall negotiate in good faith with respect to the language of such standard terms. However, unless and until such more formal agreement is executed, this Agreement shall nevertheless be deemed a binding agreement between the parties.

**AGREED AND ACCEPTED BY:**

**FREAK SHOW ENTERTAINMENT**

By: _____

Date: _9/22/2009_____

**CAMELOT DISTRIBUTION GROUP, INC.**

By: _____

Date: _9/22/2009_____

**EXHIBIT  B**

<u>**Promissory Note**</u>
<u>**Term Loan**</u>

**$650,000.00**                                                                April 27, 2010

FOR VALUE RECEIVED, CAMELOT FILM GROUP, INC., a Nevada corporation qualified
to do business in California with a place of business at 10 Universal City Plaza NBC/Universal Building,
20th Floor, Universal City, CA 91608 ("*Borrower*"), shall pay to the order of INCENTIVE CAPITAL,
LLC, a Utah limited liability company with a place of business at 2755 E. Cottonwood Parkway, Suite
100, Salt Lake City, UT 84121, and its successors and assigns ("*Lender*"), the principal amount of Six
Hundred Fifty Thousand and No/100 Dollars ($650,000.00) plus interest from this date until paid. The
principal amount together with accrued interest thereon shall be due and payable on January 31, 2011
("*Maturity*"). Lender has advanced the initial principal amount of $500,000 to Borrower. Within fourteen
(14) days from the date that Borrower makes at least one "Distribution Payment" (defined below and in
the Security Agreement, incorporated herein by this reference, to Lender as set forth herein and in the
Security Agreement, Lender shall advance $60,000 to Borrower ("*Additional Principal Amount*"); the
remaining $90,000 (the $150,000 constituting the "*Operational Advance*") shall be disbursed to
Borrower as follows: $45,000 to Borrower on or before May 27, 2010, which shall be conditioned upon
(a) Borrower's and Guarantors' performance of all other obligations under this Note and the related loan
documents executed concurrently herewith (the "*Loan Documents*"); and (b) all representations and
warranties by Borrower and the Guarantors in the Loan Documents being true and accurate; and $45,000
to Borrower on or before June 27, 2010, which shall be conditioned upon (c) Lender's reasonable
satisfaction with Borrower's efforts to exploit the Liberation Assets being purchased with the initial
principal advance hereunder upon confirming that all of the representations and warranties of Borrower
are accurate and upon receiving at least one other (a second) distribution payment on the 10% of gross
(defined as the "Distribution Payments") set forth in the Security Agreement (incorporated herein by this
reference). Any and all Distribution Payments to Lender must be accompanied by verifiable
documentation supporting the calculation of the distribution amount. In other words, the Distribution
Payment must actually be derived from 10% of the gross revenue generated from the exploitation of the
Library as further set forth in this and the other contemporaneous documents executed herewith.

Interest. Borrower shall pay interest on all principal amounts advanced hereunder at the rate of
one and one-half percent (1.50%) per month. All computations of interest shall be made on the basis of a
360-day year and paid for the actual number of days elapsed. Whether or not this Note is prepaid,
Borrower shall pay Lender no less than six (6) months of interest – or nine percent (9%) -- on the
principal amount advanced hereunder.

Payments. Commencing May 27, 2010, and continuing on the 27th day of each consecutive
month until Maturity, Borrower shall pay interest then accrued and unpaid on the outstanding balance of
this Note. At Maturity or the earlier acceleration of this Note, Borrower shall pay the entire principal
amount, plus all accrued and unpaid interest and fees due as set forth in the Loan Documents hereinafter
defined. Borrower shall make all payments on this Note to Lender at its address stated above, or at such
other place as the Lender or any other holder of this Note may designate. Borrower may make
prepayments of principal at any time. For any payment due under this Note not made within ten (10)
Business Days after its due date, Borrower shall pay a late fee equal to the greater of five percent (5%) of
the amount of the payment not made or $50.00. Lender shall apply all payments received on this Note to
any unpaid late charges and prepayment premiums (if any), accrued and unpaid interest then due and
owing, and the reduction of principal of this Note, in such order and in such amounts as Lender may

1

determine from time to time. The sum or sums shown on Lender's records shall be rebuttably presumptive of the correct unpaid balance of principal and interest on this Note. If any payment comes due on a day that is not a Business Day, Borrower may make the payment on the first Business Day following the payment date and pay the additional interest accrued to the date of payment. "Business Day" means a day of the year on which banks are not required or authorized by law to close in Salt Lake City, Utah.

**Fees.** As additional consideration for the extension of credit by Lender evidenced by this Note, Borrower shall pay Lender (a) a closing fee, and (b) an origination fee, each in the amount of Sixteen Thousand Two Hundred Fifty Dollars ($16,250.00), for a total of Thirty Two Thousand Five Hundred Dollars ($32,500.00), on or before the date of Maturity. The said closing fee and origination fee shall be included in the principal amount of this Note and shall be deemed a principal advance under the terms of this Note, and said fees shall bear interest under this Note as set forth herein above. As further consideration, $20,000 in legal fees shall be withheld by Lender as follows: $10,000 from the Additional Principal Amount; $5,000 from the May 27, 2010 Operational Advance; and $5,000 from the June 27, 2010 Operational Advance.

**Default Rate.** At Lender's election, without notice or demand, Borrower shall pay interest at the rate of three and one-half percent (3.50%) per month (*"Default Rate"*) on the outstanding balance of this Note during the period that any Event of Default exists (as defined below), on past due interest on this Note, on all other amounts payable to Lender by Borrower in connection with this Note, and on any unsatisfied judgment on this Note. In no event, however, shall the interest rate on this Note exceed the highest rate permitted by law.

**Warranties.** The Borrower and each Guarantor hereunder represents and warrants to the Lender (which representations and warranties will survive the delivery of the Note) that:

1. Borrower and Guarantors are each corporations duly organized, validly existing and in good standing under the laws of the State of incorporation of each as set forth herein and has all requisite power and authority to own its property and to carry on its business as now being conducted, to execute and deliver this Note and all other instruments, agreements, and documents entered into from time to time, evidencing or securing this loan or any obligation of payment thereof or performance of Borrower's or Guarantors' obligations in connection with the transactions contemplated hereunder, each as amended (collectively referred to as *"Loan Documents"*), and to carry out the provisions and conditions of the Note and Loan Documents. Borrower is duly qualified to do business and is in good standing in every jurisdiction where the failure to so qualify would have a material adverse effect.

2. Borrower and Guarantors have full power, authority and legal right to incur the obligations provided for in, and to execute and deliver and to perform and observe the terms and provisions of this Note and the Loan Documents; each of them has been duly executed and delivered by Borrower and Guarantors and have been authorized by all required action; Borrower and Guarantors have obtained all requisite consents to the transactions contemplated thereby; and this Note and the Loan Documents constitute the legal, valid and binding obligations of Borrower and Guarantors enforceable against Borrower and Guarantors in accordance with their respective terms, except as the enforceability thereof may be limited by applicable bankruptcy, insolvency or other similar laws affecting creditors' rights generally.

3. Neither the execution and delivery of this Note and the Loan Documents, nor the compliance by Borrower and Guarantors with the terms and conditions of this Note and the Loan Documents, nor the

2

consummation of the transactions contemplated thereby, will conflict with or result in a breach of the Articles of Incorporation or Code of Regulations, as applicable, or other governing documents of Borrower or Guarantors, or any of the terms, conditions or provisions of any agreement or instrument or any charter or other corporate restriction or law, regulation, rule or order of any governmental body or agency to which Borrower or Guarantors are now a party or is subject, or imposition of a lien, charge or encumbrance of any nature whatsoever upon any of the property or assets of Borrower or Guarantors pursuant to the terms of any such agreement or instrument.

4.   No consent, approval, authorization or order of any court or governmental agency or body is required for the consummation by Borrower or Guarantors of the transactions contemplated by this Note and the Loan Documents.

5.   Neither the Borrower nor either of the Guarantors is (i) in material default under any indenture or contract or agreement to which it is a party or by which it is bound; (ii) in violation of its articles of incorporation or Code of Regulations, as applicable, or any other governing document; (iii) in default with respect to any order, writ, injunction or decree of any court; or (iv) in default under any order or license of any federal or state governmental department. There exists no condition, event or act which constitutes, or after notice or lapse of time or both would constitute, an Event of Default.

6.   The Borrower has furnished to the Lender financial assumptions which, in the opinion of Borrower, fairly and accurately reflect the financial assumptions for the operations of Borrower, and there has been no material adverse change in the Borrower's financial prospects since that date which would require revision of the same.

7.   The Borrower represents and warrants that the international sales projections previously provided by Borrower in connection with the parties' initial term sheet shall not vary by more than 25% less than that represented therein on the estimated low value and short term sales potential 10% columns. A copy of the international sales projections is attached hereto as Exhibit A.

**Collateral/Guaranties.**   Borrower has secured this Note with one or more security agreements of even date herewith.  This Note is guaranteed by each of (a) Camelot Distribution Group, Inc., a Nevada corporation qualified to do business in California with places of business at 318 North Carson Street, Suite 208, Carson City, Nevada 89701 and at 10 Universal City Plaza NBC/Universal Building, 20th Floor, Universal City, CA 91608; (b) Camelot Entertainment Group, Inc., a Delaware corporation qualified to do business in California with a place of business at 10 Universal City Plaza NBC/Universal Building, 20th Floor, Universal City, CA 91608; and (c) Robert P. Atwell, with an address of 28852 Rockport Drive, Laguna Niguel, CA 92677 (individually and collectively, "*Guarantors*") under guaranty agreements of even date herewith.  As used in this Note, the term "Obligor" means (i) a person whose credit or any of whose property is pledged to payment of this Note and includes, without limitation, any Guarantor; and (ii) any signatory to a Loan Document.

**Events of Default.**   The occurrence of any one or more of the following events shall constitute an Event of Default under this Note:

1.   If (a) the interest hereunder or any commitment or other fee due under the Loan Documents shall not be paid in full punctually when due and payable or within five (5) Business Days thereafter, or (b) the principal hereof shall not be paid in full punctually when due and payable.

3



2.  If Borrower or any Obligor fails to perform or observe any covenant or agreement (other than as referred to in (1) above) contained in this Note or in any other of the Loan Documents, and such failure remains unremedied for thirty (30) days after the Lender gives notice thereof to Borrower or such Obligor.

3.  If any representation, warranty or statement made in or pursuant to this Note or any Loan Document or any other material information furnished by Borrower or any Obligor to Lender or any other holder of this Note, shall be materially false or erroneous.

4.  If (a) any material provision, in the sole but reasonable opinion of Lender, of this Note or any Loan Document shall at any time for any reason cease to be valid, binding and enforceable against Borrower or any Obligor; (b) the validity, binding effect or enforceability of this Note or any Loan Document against Borrower or any Obligor shall be contested by Borrower or any Obligor without legal justification; (c) Borrower or any Obligor shall deny that it has any or further liability or obligation thereunder without legal justification; or (d) any Loan Document shall be terminated, invalidated or set aside, or be declared ineffective or inoperative or in any way cease to give or provide to Lender the benefits purported to be created thereby without legal justification.

5.  If any event of default or default shall occur under any other Loan Document, or if under any Loan Document any payment is required to be made by Borrower or any Obligor on demand of Lender, such demand is made but such payment is not made.

6.  If Borrower shall default in the payment of principal or interest due and owing upon any other material obligation for borrowed money, beyond any period of grace provided with respect thereto or in the performance or observance of any other agreement, term or condition contained in any agreement under which such obligation is created, if the effect of such default is to allow the acceleration of the maturity of such indebtedness or to permit the holder thereof to cause such indebtedness to become due prior to its stated maturity and such default is not cured by Borrower.

7.  A final judgment or order for the payment of a material amount of money shall be rendered against Borrower or any Obligor by a court of competent jurisdiction, that remains unpaid or unstayed and undischarged for a period (during which execution shall not be effectively stayed) of thirty (30) days after the date on which the right to appeal has expired.

8.  There shall have occurred any condition or event that Lender reasonably determines has or is reasonably likely to have a material adverse effect on (a) the business, operations, property or condition (financial or otherwise) or prospects of Borrower; (b) the business, operations, property or condition (financial or otherwise) of Borrower and its subsidiaries, if any, taken as a whole; or (c) the validity or enforceability of this Note or any of the other Loan Documents or the rights and remedies of Lender hereunder or thereunder.

9.  If Borrower or any Obligor shall (a) discontinue business, (b) generally not pay its debts as such debts become due, (c) make a general assignment for the benefit of creditors, (d) apply for or consent to the appointment of a receiver, a custodian, a trustee, an interim trustee or liquidator of all or a substantial part of its assets, (e) be adjudicated a debtor or have entered against it an order for relief under Title 11 of the United States Code, as the same may be amended from time to time, (f) file a voluntary petition in bankruptcy or file a petition or an answer seeking reorganization or an arrangement with creditors or seeking to take advantage of any other law (whether federal or state) relating to relief of debtors, or admit (by answer, by default or otherwise) the material allegations of a petition filed against it

4

in any bankruptcy, reorganization, insolvency or other proceeding (whether federal or state) relating to relief of debtors, (g) suffer or permit to continue unstayed and in effect for thirty (30) consecutive days any judgment, decree or order entered by a court of competent jurisdiction, that approves a petition seeking its reorganization or appoints a receiver, custodian, trustee, interim trustee or liquidator of all or a substantial part of its assets, or (h) take any action in order thereby to effect any of the foregoing, or omit to take, any action in order to prevent any of the foregoing.

**Remedies upon Default.** If any Event of Default shall occur, Lender may, at its election, and without demand or notice of any kind, do any one or more of the following:

1.  Declare all of the Borrower's obligations to Lender under this Note immediately due and payable, whereupon all unpaid principal, interest and fees in respect of this Note and the Loan Documents, together with all of Lender's costs, expenses and attorneys' fees related thereto, under the terms of this Note or otherwise, shall be immediately due and payable;

2.  Exercise any and all rights and remedies available to Lender under any applicable law;

3.  Exercise any and all rights and remedies granted to Lender under the terms of this Note and any of the other Loan Documents; and/or

4.  Set off the unpaid balance hereunder against any debt owing to Borrower by the Lender.

**Governing Law.** This Note shall be construed and enforced under the laws of the State of Utah and any applicable federal laws. Time is of the essence in the payment of this Note. All grace periods in this Note and all other Loan Documents shall run concurrently.

**Notices.** All notices, requests, demands and other communications provided for hereunder shall be in writing and, if to Borrower, mailed or delivered to it, addressed to it at the address specified on the signature pages of this Note, or if to Lender, mailed or delivered to it, addressed to the address of Lender specified on the front page of this Note. All notices, statements, requests, demands and other communications provided for hereunder shall be deemed to be given or made when delivered or forty-eight (48) hours after being deposited in the mails with postage prepaid by registered or certified mail, addressed as aforesaid, or sent by facsimile with telephonic confirmation or receipt, except that notices from Borrower to Lender pursuant to any of the provisions hereof shall not be effective until received by Lender.

**Binding Effect.** This Note shall be binding upon the Borrower and upon Borrower's respective heirs, successors, assigns and legal representatives, and shall inure to the benefit of the Lender and its successors, endorsees and assigns.

**Amendments.** Any amendment hereof must be in writing and signed by the party against whom enforcement is sought. Unenforceability of any provision hereof shall not affect the enforceability of any other provision. A photographic or other reproduction of this Note may be made by the Lender, and any such reproduction shall be admissible in evidence with the same effect as the original itself in any judicial or administrative proceeding, whether or not the original is in existence.

**Indemnification.** In consideration of this loan, Borrower hereby releases and discharges Lender and its shareholders, directors, officers, employees, agents and attorneys (collectively, *"Related Parties"*) from any and all claims, demands, liability and causes of action whatsoever, now known or unknown,

5



arising out of or any way related to any of the Borrower's obligations hereunder or under the Loan Documents provided the Lender complies with its obligations to Borrower under this Note and the Loan Documents. Borrower shall indemnify, defend and hold harmless the Lender and the Related Parties against any claim brought or threatened against the Lender by the Borrower, any Guarantor or endorser hereof, or any other person on account of Lender's relationship with the Borrower or any Guarantor or endorser hereof provided the Lender complies with its obligations to Borrower under this Note and the Loan Documents.

**No Waiver.** None of the following will be a course of dealing, estoppel, waiver, or implied amendment on which any party to this Note or any Loan Document may rely: (1) Lender's acceptance of one or more late or partial payments; (2) Lender's forbearance from exercising any right or remedy under this Note, or any document providing security for or guaranty of repayment of this Note; or (3) Lender's forbearance from exercising any right or remedy under this Note or any Loan Document on any one or more occasions. Lender's exercise of any rights or remedies or a part of a right or remedy on one or more occasions shall not preclude Lender from exercising the right or remedy at any other time. Lender's rights and remedies under this Note, the Loan Documents, and the law and in equity are cumulative to, but independent of, each other.

**Costs, Expenses, Fees and Taxes.** Borrower agrees to pay on demand all costs and expenses of Lender, including but not limited to (a) administration, travel and out-of-pocket expenses, including but not limited to reasonable attorneys' fees and expenses, of Lender in connection with the preparation, negotiation and closing of the Loan Documents and the administration of the Loan Documents, the collection and disbursement of all funds hereunder and the other instruments and documents to be delivered hereunder, (b) extraordinary expenses of Lender in connection with the administration of this Note and the other Loan Documents, (c) the reasonable fees and out-of-pocket expenses of special counsel for Lender, if any, with respect to the foregoing, and of local counsel, if any, who may be retained by said special counsel with respect thereto, (d) all fees due in any of the Loan Documents, and (e) all costs and expenses, including reasonable attorneys' fees, in connection with the determination of Lender's lien priority in any collateral securing this Note, or the restructuring or enforcement of this Note or any Loan Document. In addition, Borrower shall pay any and all stamp and other taxes and fees payable or determined to be payable in connection with the execution and delivery of any Loan Document, and the other instruments and documents to be delivered hereunder, and agrees to hold Lender harmless from and against any and all liabilities with respect to or resulting from any delay in paying or omission to pay such taxes or fees. Notwithstanding anything to the contrary contained hereinabove, Lender expressly agrees that Borrower shall pay Lender a cumulative total of no more than $10,000 for all fees and expenses referenced in sections (a), (b) and (c) above upon Lender's providing Borrower with bills or invoices for all such fees and expenses.

**Borrower Waivers.** Borrower waives presentment, demand, notice, protest, and all other demands and notices in connection with delivery, acceptance, performance, default, or enforcement of this Note.

**Jurisdiction.** Borrower hereby irrevocably submits to the non-exclusive jurisdiction of any Utah state or federal court sitting in Salt Lake City, Utah, over any action or proceeding arising out of or relating to this Note, and Borrower hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such Utah state or federal court. Borrower hereby waives any objection that it may now or hereafter have to the venue of any such suit or any such court or that such suit is brought in an inconvenient court.

6



**Jury Trial Waiver.** BORROWER WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, BETWEEN LENDER AND BORROWER ARISING OUT OF, IN CONNECTION WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THIS NOTE OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED THERETO.

**Borrower:**

Camelot Film Group, Inc.

By: _____
Robert P. Atwell, President

**Guarantors:**

Camelot Distribution Group, Inc.

By: _____
Robert P. Atwell, President

Camelot Entertainment Group, Inc.

By: _____
Robert P. Atwell, President

_____
Robert P. Atwell, Individually

7

**Exhibit A**
Avails by Key Territory Summary

| Territory | # Avail PTV | Low License fee per title | Estimated Total Value (low) | Short Term Sales Potential (10%) | Med License fee per title | Estimated Total Value (med) | Short Term Sales Potential (10%) |
|---|---|---|---|---|---|---|---|
| CIS (Fmr USSR) | 261 | $2,500 | $652,500 | $65,250 | $5,000 | $1,305,000 | $130,500 |
| Benelux | 290 | $2,000 | $580,000 | $58,000 | $4,000 | $1,160,000 | $116,000 |
| Bulgaria | 289 | $1,000 | $289,000 | $28,900 | $2,000 | $578,000 | $57,800 |
| Czech | 366 | $2,000 | $732,000 | $73,200 | $3,000 | $1,098,000 | $109,800 |
| Fmr Yugo | 291 | $1,000 | $291,000 | $29,100 | $1,500 | $436,500 | $43,650 |
| France | 287 | $5,000 | $1,435,000 | $143,500 | $8,000 | $2,296,000 | $229,600 |
| Germany | 310 | $5,000 | $1,550,000 | $155,000 | $10,000 | $3,100,000 | $310,000 |
| Greece | 287 | $2,000 | $574,000 | $57,400 | $4,000 | $1,148,000 | $114,800 |
| Hungary | 293 | $2,000 | $586,000 | $58,600 | $4,000 | $1,172,000 | $117,200 |
| Italy | 273 | $5,000 | $1,365,000 | $136,500 | $8,000 | $2,184,000 | $218,400 |
| Poland | 287 | $3,000 | $861,000 | $86,100 | $5,000 | $1,435,000 | $143,500 |
| Portugal | 289 | $1,500 | $433,500 | $43,350 | $3,000 | $867,000 | $86,700 |
| Romania | 332 | $1,500 | $498,000 | $49,800 | $3,000 | $996,000 | $99,600 |
| Scandinavia | 291 | $3,000 | $873,000 | $87,300 | $6,000 | $1,746,000 | $174,600 |
| Spain | 261 | $4,000 | $1,044,000 | $104,400 | $8,000 | $2,088,000 | $208,800 |
| United Kingdom | 187 | $5,000 | $935,000 | $93,500 | $10,000 | $1,870,000 | $187,000 |
| S Africa | 286 | $1,500 | $429,000 | $42,900 | $3,000 | $858,000 | $85,800 |
| Thailand | 292 | $1,000 | $292,000 | $29,200 | $2,000 | $584,000 | $58,400 |
| Middle East | 290 | $2,000 | $580,000 | $58,000 | $5,000 | $1,450,000 | $145,000 |
| Turkey | 265 | $2,000 | $530,000 | $53,000 | $4,000 | $1,060,000 | $106,000 |
| Japan | 278 | $5,000 | $1,390,000 | $139,000 | $9,000 | $2,502,000 | $250,200 |
| Australia/NZ | 269 | $3,000 | $807,000 | $80,700 | $6,000 | $1,614,000 | $161,400 |
| Latin America | 258 | $8,000 | $2,064,000 | $206,400 | $14,000 | $3,612,000 | $361,200 |
| USA | 287 | $10,000 | $2,870,000 | $287,000 | $15,000 | $4,305,000 | $430,500 |
| Canada | 296 | $4,000 | $1,184,000 | $118,400 | $7,000 | $2,072,000 | $207,200 |
| **Total** | | | **$22,845,000** | **$2,284,500** | | **$41,536,500** | **$4,153,650** |

**EXHIBIT C**

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT ("Security Agreement"), dated as of April 27, 2010 by and between **Camelot Distribution Group, Inc.**, a Nevada corporation ("Debtor") and **Incentive Capital, LLC**, a Utah limited liability company ("Secured Party"), is made with reference to the following facts:

    A.    Camelot Film Group, Inc. ("Borrower") has executed or shall execute and deliver to Secured Party simultaneously herewith that certain Promissory Note -Term Loan (the "Note") in the original principal amount of $650,000 in connection with a secured term loan (the "Loan") from Secured Party to Borrower.

    B.    Debtor has agreed to grant the Secured Party a security interest in the property hereinafter described as security for the prompt and complete payment of the payment and other obligations of the Borrower to the Secured Party under the Note.

    NOW, THEREFORE, in consideration of the foregoing and the mutual promises and other agreements hereinafter contained, Debtor hereby agrees with Secured Party for the benefit of Secured Party as follows:

    1.    <u>Grant of Security Interest</u>.

Debtor hereby grants to the Secured Party a continuing first priority security interest in all Debtor rights to the property as set forth on **Schedule 1** attached hereto ("Distribution Assets") and by this reference incorporated herein, and all products and proceeds thereof, including (a) the Distribution Assets; (b) all accounts, negotiable instruments, chattel paper and electronic chattel paper, general intangibles, proceeds, and monies derived from the disposition or other exploitation of the Distribution Assets in all media, from all sources, worldwide during the term hereof; and (c) other assets of the Debtor as set forth on said Schedule 1 (collectively, the "Collateral") . Terms used in this Security Agreement are used as defined in (i) the Utah Uniform Commercial Code in effect from time to time; or (ii) the Asset Purchase Agreement executed by Borrower concurrently herewith (the "Purchase Agreement").

    2.    [Reserved.]

    3.    <u>Security for Obligations</u>. This Security Agreement secures, and the Collateral is collateral security for, the prompt payment or performance in full when due, whether at stated maturity, by acceleration or otherwise (including the payment of amounts which would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. Section 362(a)), to Secured Party of Debtor's indebtedness and other obligations now existing or hereafter arising to Secured Party with respect to the Note, whether for principal or interest (including, without limitation, interest which, but for the filing of a petition in bankruptcy, would accrue on such obligations) or payments of fees, expenses or otherwise pursuant to the Note and/or any other documents or instrument executed pursuant thereto or hereto (all such obligations being the "Note").

- 1 -



4.    <u>Actions to Perfect</u>.  Debtor hereby authorizes Secured Party at any time and from time to time to file one or more financing or continuation statements describing the Collateral.  Debtor further agrees that at any time and from time to time, at the expense of the Debtor, Debtor will promptly execute and deliver all further instruments and documents, and take all further action that may be reasonably necessary or desirable, or that Secured Party may reasonably request, in order to perfect and protect any security interest granted or purported to be granted hereby or to enable Secured Party to exercise and enforce its rights and remedies hereunder with respect to any Collateral.  Such actions may include, without limitation, the delivery to Secured Party of Collateral for which delivery is required to perfect, the signature by bailees or depository banks on control agreements in favor of Secured Party with respect to Collateral in the possession of bailees, or complying with the provisions of any applicable statutes governing perfection or protection of the security interest granted hereby in the Collateral.

5.    <u>Representations and Warranties</u>.  Debtor represents and warrants as follows:

(a)    <u>Status of Debtor; Authorization</u>.  Debtor (i) is a corporation duly organized, validly existing and in good standing under the laws of the state of Nevada, and (ii) is duly qualified or licensed to conduct business in each jurisdiction in which the nature of its business or assets requires such qualification or licensing under applicable law except where the failure to be so qualified would not have a material adverse effect on the business, operations or financial condition of Debtor.  Debtor has the requisite power and authority to own its assets and to transact the business in which it is presently engaged and in which it proposes to engage and to grant to Secured Party the security interests in the Collateral as herein provided.  Debtor has taken all action necessary to authorize the execution and delivery of this Security Agreement, and the consummation of the transactions contemplated hereby.

(b)    <u>Binding Security Agreement</u>.  This Security Agreement constitutes the legal, valid and binding agreement and obligation of Debtor, enforceable against Debtor in accordance with its terms, except as enforceability may be limited by the bankruptcy, insolvency, fraudulent conveyance, and similar laws and equitable principles affecting the enforcement of creditors' rights generally.

(c)    <u>Title to Collateral</u>.  Debtor has good and marketable title to its interest in the Collateral, free and clear of any mortgage, pledge, lien, security interest, encumbrance, conditional sale contract or other title retention agreement, or any other adverse claim of any nature whatsoever (collectively, "Lien") except for (x) the first priority security interest granted to the Secured Party hereby.  No effective financing statement or other instrument similar in effect covering all or any part of the Collateral is on file in any recording office.

(d)    <u>No Default or Required Consent</u>.  The execution, delivery and performance of this Security Agreement by Debtor, and the effectuation by the Secured Party of any of its rights and remedies thereunder or hereunder, whether upon default or

-2-



otherwise, (x) will not result in a breach of or constitute a default under (i) the certificate of incorporation or bylaws or other charter provision of Debtor, or (ii) any other agreement or instrument to which Debtor is a party or by which any of the Collateral is bound except, in the case of clause (ii), where such breach or default would not have a material adverse effect on the Collateral or on the business, operations or financial condition of Debtor, (y) will not violate any law or any rule or regulation of any administrative agency or any order, writ, injunction or decree of any court or administrative agency, and (z) does not require the consent of any person, entity or governmental agency or any notice or filing with any governmental or regulatory body, except as shall have been previously obtained, given or made or where the failure to obtain such consent would not have a material adverse effect on the Collateral or on the business, operations or financial condition of Debtor.

      (e)   Perfection.  Debtor's exact legal name, type of organization and jurisdiction of organization is set forth in the introduction of this Security Agreement. Debtor's organizational identification number is NV20051246701. Debtor's principal place of business is located at the address set forth on the date hereof in Section 14 of this Security Agreement.  Upon (i) the execution and delivery of this Security Agreement by Debtor; and (ii) the proper and timely filing of a financing statement with the Secretary of State of Nevada, the Secured Party will have a first perfected first priority security interest in and to the Collateral.

      (f)   Employment of Jamie Thompson:  Debtor has entered into an employment agreement with Jamie Thompson  ("Thompson") as of September 1, 2009 (the "Employment Agreement"),  whereunder Thompson shall render services as President of Debtor to, among other responsibilities, manage and supervise Debtor's general business operations, including without limitation services in connection with the exploitation of the Liberation Assets. Debtor hereby acknowledges and agrees that it shall use its best efforts to continue Thompson's Employment Agreement for a period of five (5) years from the date hereof.  During said period of the Employment Agreement, Thompson shall be primarily responsible for the exploitation of the Liberation Assets.

    6.   Affirmative Covenants.  Debtor covenants and agrees that until such time as the Note is indefeasibly paid or otherwise satisfied in full, unless the Secured Party shall otherwise consent in writing:

      (a)   Conduct of Business and Maintenance of Assets and Licenses. Debtor shall do or cause to be done all things reasonably necessary to preserve in full force and effect its existence, its corporate powers and authority, its qualifications to carry on business in all applicable jurisdictions, and all rights, interests and assets necessary to the conduct of its business, except where the failure to do so does not have a material adverse effect on the financial condition or operations of Debtor.

      (b)   Protection of Security and Legal Proceedings. Debtor shall, at its own expense, take any and all actions reasonably necessary to preserve, protect and defend the security interests of the Secured Party in the Collateral and the perfection and priority thereof against any and all adverse claims, including appearing in and defending all actions

-3-



and proceedings which purport to affect any of the foregoing. Debtor shall promptly reimburse the Secured Party for any and all sums, including costs, expenses and actual attorneys' fees, which the Secured Party may pay or incur in defending, protecting or enforcing its security interest in the Collateral or the perfection or priority thereof.

(c)    Payment of Taxes. Debtor shall pay or cause to be paid all taxes and other levies with respect to the Collateral when the same become due and payable, except for any taxes which are being diligently contested in good faith by appropriate proceedings and for which appropriate reserves have been established.

(d)    Use and Maintenance of Collateral. Debtor shall comply in all material respects with all laws, statutes and regulations pertaining to its use and ownership of the Collateral and its conduct of its business; maintain all of the Collateral in good condition, reasonable wear and tear excepted, and keep accurate and complete books and records pertaining to the Collateral in accordance with generally accepted accounting principles, except where the failure to do any of the foregoing does not have a material adverse affect on the Collateral or the Secured Party's rights therein.

(e)    Inspection. Debtor shall give the Secured Party such information as may be reasonably requested concerning the Collateral and shall during regular business hours and upon reasonable notice during the continuance of an Event of Default, permit the Secured Party and its agents and representatives to have full access to and the right to examine, audit and make copies and abstracts from any and all of Debtor's books and records pertaining to the Collateral, to confirm and verify the value of the Collateral and to do whatever else the Secured Party reasonably may deem necessary or desirable to protect its interests. Furthermore, Debtor agrees to furnish promptly to the Secured Party such information regarding the financial condition or business of Debtor or the Collateral as the Secured Party may reasonably request, and all such information hereafter furnished to the Secured Party by Debtor will be true and correct in all material respects when furnished.

(f)    Notification. Debtor shall notify the Secured Party in writing within ten (10) business days of the occurrence of any event which materially adversely affects the value of the Collateral, the ability of Debtor or the Secured Party to dispose of the Collateral or the rights and remedies of the Secured Party in relation thereto.

7.    Negative Covenants. Debtor covenants and agrees that until such time as the Note is indefeasibly paid or otherwise satisfied in full, without the prior written consent of the Secured Party:

(a)    Sale or Hypothecation of Collateral. Debtor shall not directly or indirectly, whether voluntarily, involuntarily, by operation of law or otherwise (i) sell, assign, license, transfer, exchange, lease, lend, grant any option with respect to or dispose of any of the Collateral or any of Debtor's rights therein, except for sales, assignments, licenses, transfers, exchanges, leases or loans in the ordinary course of the Debtor's business; nor (ii) create or permit to exist any lien on or with respect to any of the Collateral. The

-4-



inclusion of "proceeds" as a component of the Collateral shall not be deemed a consent by the Secured Party to any sale, assignment, transfer, exchange, lease, loan, granting of an option with respect to or disposition of all or any part of the Collateral.

(b)   Change of Location or Name.   Debtor shall not, without giving to the Secured Party at least thirty (30) days' prior written notice (i) move its principal place of business; (ii) change its name, its trade or fictitious business name(s) or its organizational identification number; (iii) keep Collateral at locations other than its principal place of business, except as otherwise disclosed to Secured Party in writing; or (iv) change its type of organization, jurisdiction of organization or other legal structure.

8.   Secured Party Appointed Attorney-In-Fact.   Debtor hereby appoints the Secured Party as Debtor's attorney-in-fact with full authority in the place and stead of Debtor and in the name of Debtor or otherwise, from time to time in the Secured Party's sole and absolute discretion to take any action and to execute any instrument which the Secured Party may deem necessary or advisable to accomplish the purposes of this Security Agreement. Debtor acknowledges that the foregoing grant of power of attorney is coupled with an interest and is irrevocable.

9.   Secured Party May Perform.   If Debtor fails to perform any agreement or covenant contained herein, then the Secured Party in its discretion may perform or cause the performance of such agreement or covenant, and the reasonable expenses of the Secured Party incurred in connection therewith shall be payable by the Debtor. However, nothing in this Security Agreement shall obligate Secured Party to act, nor shall the actions of Secured Party under this section be construed as a waiver or cure of any such failure.

10.   Remedies upon Default.

(a) "Event of Default" shall mean the occurrence of any of the following events:

I.   The failure of Borrower to pay the Note when due.

II.   The failure, refusal or neglect of Debtor, Borrower or any guarantor to observe or perform for any reason any of the covenants, conditions, agreements or provisions contained in this Security Agreement or in any of the other agreements or instruments referenced herein or contemplated hereby (referred to herein individually as a "Loan Document" and collectively as the "Loan Documents") (other than the payment of the Note of which the failure to pay constitutes an Event of Default described in Section 9(a)I hereof) or to execute and deliver any documents, agreements or instruments reasonably requested by Secured Party hereunder or thereunder, provided that if such failure, refusal or neglect is capable of remedy within fifteen (15) days the Debtor shall be entitled to cure the same within fifteen (15) days of Debtor's receipt of written notice from Secured Party of the occurrence of such failure, refusal or neglect.

III.   Any representation or warranty made by Debtor, Borrower or any guarantor in any Loan Document or any report, certificate, financial statement or other

- 5 -



Instrument furnished by or on behalf of Debtor in connection with any Loan Document shall prove to have been false or misleading in any material respect.

iv.    Subject to the provisions of Section 6.6 of the Purchase Agreement, Secured Party shall cease to have valid and perfected first priority security interest at any time for any reason in the Collateral, or any portion thereof.

v.    If any judgment against Debtor or any of its property or assets which would or might materially adversely affect (a) its ability to perform its obligations under any Loan Document; and/or (b) the Collateral and/or the Secured Party's rights therein, remains unpaid, unstayed or undismissed for a period of more than forty-five (45) days.

vi.    Debtor shall be dissolved or shall sustain the loss, cancellation or forfeiture of its legal status or good standing by reason of any judicial, extrajudicial or administrative proceedings or otherwise, or shall (a) apply for or consent to the appointment of a receiver, trustee or liquidator of Debtor or of all or a substantial part of Debtor's assets; (b) be unable to, or admit in writing its inability to, pay its debts as they mature; (c) make a general assignment for the benefit of creditors; (d) be adjudicated a bankrupt or insolvent; (e) file a voluntary petition in bankruptcy or a petition or an answer seeking reorganization or an arrangement for the benefit of creditors or take advantage of any insolvency law in its capacity as a debtor; (f) interpose an answer admitting the material allegations of the petition filed against Debtor in any bankruptcy, reorganization or insolvency proceedings; (g) take any action which would have the effect of dissolving Debtor; or (h) take any action for the purpose of effecting any of the foregoing.

vii.    Any (a) involuntary petition is filed against Debtor seeking to subject Debtor to any bankruptcy, insolvency or similar laws and such petition shall remain unstayed or not be withdrawn for a period of forty-five (45) days; or (b) an order, judgment or decree shall be entered against Debtor by any court of competent jurisdiction approving a petition seeking its reorganization or appointment of a receiver, trustee or liquidator of Debtor or of all or a substantial part of its assets and such order, judgment or decree shall continue and stay in effect for a period of forty-five (45) days.

(b)    If an Event of Default exists, the Secured Party may exercise one or more of the following rights and remedies at any time or times and without notice to or demand upon Debtor:

(i)    Declare the Note to be forthwith due and payable, whereupon the Note shall be accelerated and shall become immediately due and payable without presentation, demand or notice of any kind to the Debtor (all of which are hereby waived by Debtor ), except that if an Event of Default specified in Sections 9(a)(vi) and 9(a)(vii) shall occur, such acceleration shall be automatic and no declaration or other act of Secured Party shall be necessary to effect such acceleration;

(ii)    Proceed to protect and enforce the rights of Secured Party to payment of the Note and its rights to proceed against the Collateral and exercise its remedies

whether by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision of any of the Loan Documents or any other legal or equitable right or remedy of Secured Party;

(iii)   In addition to those actions that may otherwise be permitted to be taken by Secured Party under any of the Loan Documents, with respect to the Collateral, take the following actions:

(a)   Collections, etc.  Secured Party may demand, sue for, collect or receive, in the name of Secured Party or in the name of Debtor, or otherwise, any money or property at any time payable or receivable on account of or in exchange for, or make any compromise or settlement deemed desirable with respect to, any of the Collateral (but Secured Party shall be under no obligation to do so), or extend the time of payment, arrange for payment in installments, or otherwise modify the term of, or release, any of the Collateral, without thereby incurring responsibility to discharge, or discharging, or otherwise affecting any liability of Debtor hereunder.  Secured Party shall not be required to take any steps to preserve any rights against other parties to the Collateral.  Secured Party may (but is not obligated to) make such payments and take all such actions as Secured Party deems necessary to protect its security interest in the Collateral and/or the value thereof, and Secured Party is hereby authorized (without limiting the general nature of the authority hereinabove conferred) to pay, purchase, contest or compromise any lien or encumbrance on the Collateral; and

(b)   Possession and Sale of Collateral, etc.  Secured Party may exercise in respect of the Collateral all rights and remedies hereunder and under the Loan Documents, all the rights and remedies of a secured party under the Code and all rights and remedies otherwise available to it.  In addition, Secured Party may notify any and all account debtors of the Debtor to make all further payments to Secured Party, and enter upon each premises of wherever the Collateral may be and take possession of the Collateral and demand and receive such possession from any Person who has possession thereof; and take such measures as it may deem necessary or proper for the care or protection thereof, including the right to remove all or any portion of the Collateral (but Secured Party shall not be obligated to do so).  With or without taking such possession, Secured Party may sell or cause to be sold, whenever Secured Party shall decide, in one or more sales or parcels, and at such price or prices and upon such other terms as may be commercially reasonable (irrespective of the impact of any such sales on the market price of such assets), and for cash or on credit or for future delivery, without assumption of any credit risk, all or any portion of the Collateral at any broker's board or at public or private sale.  Secured Party may be the purchaser at any public or private sale to the extent permitted by law and provided such sale is conducted in accordance with the Code of any or all of the Collateral so sold and shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of such assets sold at any such public or private sale, to use and apply the Note as a credit on account of the purchase price payable by Secured Party at such sale.  Each purchaser (including the Secured Party) at any such sales shall thereafter hold the Collateral purchased absolutely

-7-



free from any claim or right of whatever kind, including any equity of redemption of the Debtor, any such demand, notice, claim, right and equity being hereby expressly waived and released. Debtor agree that, to the extent notice of sale shall be required by law, at least ten (10) days' notice of sale to the Debtor of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. Secured Party shall not be obligated to make any sale of the Collateral regardless of notice of sale having been given. Secured Party may adjourn any public or private sale from time to time by announcement at the time and place fixed therefore, and such sale may, without further notice be made at the time and place to which it was so adjourned. Debtor hereby waive any claims against Secured Party arising by reason of the fact that the price at which any Collateral may have been sold at such a private sale was less than the price which might have been obtained at a public sale, even if Secured Party accepts the first offer received and does not offer such Collateral to more than one offeree, provided such private sale is conducted in a commercially reasonable manner.

(c)     Appointment of a Receiver.  Upon the occurrence of an Event of Default, the Secured Party shall be entitled to the appointment of a receiver, to take possession of all or any portion of the Collateral and to exercise such powers as the court shall confer upon the receiver.

(d)     Power of Attorney.  Debtor does hereby irrevocably make, constitute, and appoint the Secured Party and its designees as its true and lawful attorney-in-fact, with full power in the name of Secured Party and/or Debtor, to take the following actions upon the occurrence of an Event of Default: to endorse any notes, checks, drafts, money orders or other evidences of payment relating to the Collateral that may come into the possession of the Secured Party; to enforce all of Debtor's rights under and pursuant to all agreements with respect to the Collateral, all for the sole benefit of Secured Party, to enter into and perform such agreements as may be necessary in order to carry out the terms, covenants, and conditions of this Security Agreement which are required to be observed or performed by Debtor, to execute such other and further mortgages, pledges and assignments of the Collateral as Secured Party may require for the purpose of protecting, maintaining, or enforcing the security interests granted to Secured Party by this Security Agreement and the other Loan Documents, and to do any and all other things necessary or proper to carry out the intention of this Security Agreement and the other Loan Documents; and Debtor hereby ratifies and confirms all the Secured Party, as such attorney-in-fact, or its substitutes shall properly do by virtue of this power of attorney, provided, however, that Secured Party agrees to notify Debtor prior to any such endorsement, execution or action and to provide Debtor with a reasonable period to endorse or execute the subject documents on Debtor's own behalf.  Such powers of attorney are coupled with an interest and are therefore irrevocable.

(e)     Rights and Remedies Cumulative.  No right or remedy conferred upon Secured Party herein or in any of the other Loan Documents or otherwise available at law or in equity (or both) shall be exclusive of any other right or remedy contained herein or therein or otherwise made available. All such rights and remedies are



- 8 -

cumulative and are not exclusive of any right or remedy which Secured Party may
otherwise have.

(f)   Application of Proceeds.   Any cash held by the Secured Party
as Collateral and all cash proceeds received by either of the Secured Party in respect of
any sale of, collection from, or other realization upon all or any part of the Collateral may, in
the discretion of the Secured Party, be held by the Secured Party as collateral for, and/or
then or at any time thereafter applied (after payment of any amounts payable to Secured
Party pursuant to this Security Agreement) in whole or in part by the Secured Party against
all or any part of the Note in such order as the Secured Party shall elect.   Any surplus of
such cash or cash proceeds held by either of the Secured Party and remaining after
payment in full of all the Note shall be paid over to Debtor or to whomsoever may be
lawfully entitled to receive such surplus.

11.   Liability and Indemnification.   The powers conferred upon Secured Party
hereunder are solely to protect its interest in the Collateral and shall not impose any duty
upon it to exercise such powers.   Nothing in this Security Agreement shall be deemed to
constitute an assumption by either of the Secured Party of any liability or obligation of the
Debtor with respect to any of the Collateral.   The Secured Party shall not be liable to either
Debtor for any act (including, without limitation, any act of active negligence) or omission by
the Secured Party under this Security Agreement unless the Secured Party's conduct
constitutes willful misconduct or gross negligence.   Debtor agrees to indemnify and to hold
the Secured Party harmless from and against all losses, liabilities, claims, damages, costs
and expenses (including reasonable attorneys' fees and disbursements) with respect to (a)
any action taken (including, without limitation, any act of active negligence) or any omission
by either of the Secured Party with respect to the Payment Obligations or this Security
Agreement, provided that Secured Party's conduct does not constitute willful misconduct or
gross negligence, and (b) any claims arising out of Debtor's ownership of the Collateral or
Secured Party's security interest therein.

12.   Expenses.   Debtor agrees to pay upon demand to the Secured Party any and
all reasonable expenses, including the reasonable fees and expenses of its outside
counsel and of any experts and agents which the Secured Party may incur in connection
with (a) the custody or preservation of, or the sale of, collection from, or other realization
upon, any of the Collateral, (b) the exercise or enforcement of any of the rights of the
Secured Party under the Payment Obligation and/or this Security Agreement, and (c) the
failure by Debtor to perform or observe any of the provisions of the Payment Obligation
and/or this Security Agreement.

13.   Security Interest Absolute.   All rights of the Secured Party and security
interests hereunder shall be absolute and unconditional irrespective of:

(a)   any lack of validity or enforceability of the Purchase Agreement or any
other Loan Document;

-9-

(b)     any change in the time, manner or place of payment of, or in any other term of, all or any of the Note, or any other amendment or waiver of or any consent to any departure from any of the Loan Documents; or

(c)     any furnishing, exchange, release or non-perfection of any other collateral, or any release or amendment or waiver of or consent to departure from any guaranty for all or any of the Note.

14.     <u>Amendments, Waiver</u>.  No amendment or waiver of any provision of this Security Agreement nor consent to any departure by Debtor herefrom shall in any event be effective unless the same shall be in writing and signed by the Secured Party and Debtor and/, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose any party for which given.

15.     <u>Notices</u>.  All notices, requests, demands and other communications required or permitted to be given hereunder shall be in writing and shall be deemed to have been duly given if delivered by messenger or overnight delivery service, or sent by first class mail (or air mail where available), postage prepaid, certified or registered, return receipt requested, as set forth in the Purchase Agreement or at such other address as may be furnished in writing. Any notice given by messenger or overnight delivery service as provided in this <u>Section 15</u> shall be deemed given when delivered if during normal business hours on a business day (or if not, the next business day after delivery); any notice given by first class mail (or air mail where available), postage prepaid, certified or registered, return receipt requested shall be deemed given five (5) business days after the date of mailing.  Any party may by notice to the other change the address at which notices and demands may be given to it.

16.     <u>Continuing Security Interest; Release of Security Interest Upon Payment</u>. This Security Agreement shall create a continuing security interest in the Collateral and shall (a) remain in full force and effect until indefeasible payment or other satisfaction in full of the Note, (b) be binding upon Debtor, and its successors and assigns, (c) inure, together with the rights and remedies of the Secured Party hereunder, to the benefit of the Secured Party and its successors, transferees and assigns, (d) constitute the entire agreement between Debtor and the Secured Party with respect to the subject matters covered hereby, and (e) be severable in the event that one or more of the provisions herein is determined to be illegal or unenforceable.  Upon the indefeasible payment or other satisfaction in full of the Note, the Secured Party, at the request and expense of Debtor, shall release the security interests in the Collateral granted herein and execute such termination statements as may be necessary therefore, to the extent that such Collateral shall not have been sold or otherwise applied pursuant to the terms hereof.

17.     <u>Return of Collateral</u>.  Subject to any duty imposed by law or otherwise to the holder of any subordinate lien on the Collateral known to the Secured Party, and subject to the direction of a court of competent jurisdiction, upon payment in full of the Note, Debtor shall be entitled to the return of all Collateral belonging to Debtor in the possession of the Secured Party; provided, however, that the Secured Party shall not be obligated to return to Debtor or deliver to the holder of any subordinate lien any such Collateral until it is

- 10 -



satisfied that all amounts with respect to the Note are no longer subject to being recaptured under applicable bankruptcy or insolvency laws or otherwise. The return of Collateral, however effected, shall be without recourse to the Secured Party and the Secured Party shall be entitled to receive appropriate documentation to such effect. The return of Collateral shall be effected without representation or warranty and shall not entitle Debtor to any right to any endorsement.

18.   Governing Law: Terms. This Security Agreement shall be deemed to have been made in the state of Utah and the validity, construction, interpretation, and enforcement hereof, and the rights of the parties hereto, shall be determined under, governed by, and construed in accordance with the internal laws of the state of Utah. Debtor hereby consents to the jurisdiction of any Utah state or United States Federal court sitting in Utah with respect to disputes arising out of this Security Agreement.

19.   Waiver of Jury Trial. Debtor HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY.   Any legal action or proceeding with respect to this Security Agreement must be brought in the federal or state courts located in the State of Utah, unless Secured Party elects to bring such legal action or proceeding elsewhere. Debtor hereby irrevocably accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the federal or state courts located in the State of Utah as having proper venue. Debtor hereby irrevocably waives any objection which it may now or hereafter have to the laying of venue of any of the aforesaid actions or proceedings arising out of or in connection with this Security Agreement brought in the aforesaid Utah courts and irrevocably waives and agrees not to plead or claim in any such court that any such action or proceeding brought in any such court has been brought in an inconvenient forum, and also consents to the service of process by any means authorized by the State of Utah.

IN WITNESS WHEREOF, the parties hereto have caused this Security Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first above written.

Debtor:
CAMELOT DISTRIBUTION GROUP, INC., a Nevada corporation

By: _____
Robert P. Atwall, CEO

- 11 -

Secured Party:
**INCENTIVE CAPITAL, LLC, a Utah corporation**


<u>By:</u> _____
                              , President

# CAMELOT
## ENTERTAINMENT

10 UNIVERSAL CITY PLAZA, NBC/UNIVERSAL BUILDING 20TH FLOOR, UNIVERSAL CITY, CA 91608
P: 818.308.8858  F: 818.308.8848  E: INFO@CAMELOTFILMS.COM  W: WWW.CAMELOTENT.COM

Schedule 1

Certain distribution and license rights that have been acquired pursuant to distribution and license agreements entered into by Debtor with respect to the following films:

1. Samurai Avenger
2. First Strike
3. Screwball: The Ted Whitfield Story (aka The Wiffler)
4. The Fallen
5. One Lucky Dog (aka Weiner Dog Nationals)
6. Never Sleep Again
7. Hellraiser Unleashed
8. Finki
9. Nude Nuns With Big Guns
10. Zombie Culture
11. National Lampoons Dirty Movie
12. Who Is KK Downey
13. Next of Kin

**EXHIBIT D**

# SECURITY AND PARTICIPATION AGREEMENT

THIS SECURITY AND PARTICIPATION AGREEMENT ("Security Agreement"), dated as of April 27, 2010 by and between **Camelot Film Group, Inc.**, a Nevada corporation ("Debtor") and **Incentive Capital, LLC**, a Utah limited liability company ("Secured Party"), is made with reference to the following facts:

A.    Debtor has executed or shall execute and deliver to Secured Party simultaneously herewith that certain Promissory Note -Term Loan (the "Note") in the original principal amount of $650,000 in connection with a secured term loan (the "Loan") from Secured Party to Debtor.

B.    Debtor has agreed to grant the Secured Party a security interest in the property hereinafter described as security for the prompt and complete payment of the payment and other obligations of the Debtor to the Secured Party under the Note.

C.    Debtor has agreed to grant the Secured Party a continuing profit participation in the revenue actually received by Debtor from the Debtor's exploitation of the Liberation Assets, as set forth in this Security Agreement.

D.    The property covered by this Security Agreement includes certain assets (the "Liberation Assets") purchased substantially simultaneously herewith from CMBG Advisors, Inc., a California corporation in its sole and limited capacity as assignee for the benefit of creditors of Liberation Group, Inc. ("CMBG") pursuant to an Asset Purchase Agreement of even date (the "Asset Purchase Agreement") as well as other assets of Debtor as set forth hereinbelow.

E.    Secured Party and CMBG have entered into an Intercreditor Agreement (the "Intercreditor Agreement") contemporaneously herewith setting forth the agreed rights and obligations of each as secured parties with respect to the Liberation Assets, it being expressly understood and agreed that Secured Party shall at all times have and maintain a first priority security interest in the Liberation Assets, and CMBG shall at all times have and maintain a second priority security interest in the Liberation Assets.

NOW, THEREFORE, in consideration of the foregoing and the mutual promises and other agreements hereinafter contained, and subject to the terms and conditions of the Intercreditor Agreement, Debtor hereby agrees with Secured Party for the benefit of Secured Party as follows:

1.    <u>Grant of Security Interest</u>.

Debtor hereby grants to the Secured Party a continuing first priority security interest in all property identified on Schedule 1 attached hereto and by this reference incorporated herein, and all products and proceeds thereof, including (a) the Liberation Assets; (b) all accounts, negotiable instruments, chattel paper and electronic chattel paper, general intangibles, proceeds, and monies derived from the disposition or

- 1 -

other exploitation of the Liberation Assets in all media, from all sources, worldwide during the term hereof; and (c) other assets of the Debtor as set forth on said Schedule 1 (collectively, the "Collateral"). Terms used in this Security Agreement are used as defined in (i) the Utah Uniform Commercial Code in effect from time to time; or (ii) the Asset Purchase Agreement;

2.   Profit Participation.

(a)   Commencing on the date of this Security Agreement, the Debtor shall pay to the Secured Party ten percent (10%) of one hundred percent (100%) of all gross revenues actually received thereafter by Debtor within 14 days of receiving any such revenue, CMGR or their respective subsidiaries, successors and assigns (collectively "Camelot"), from any third party paying Camelot revenues in connection with Camelot's exploitation of the Liberation Assets in all media, worldwide, from all sources (the "Camelot Revenue"), for an initial period of five (5) years ("Initial Period") from the date of this Security Agreement ("Secured Party Initial Revenue Participation"). After the Initial Period, Camelot shall pay the Secured Party two and one-half percent (2.5%) of all such revenues, calculated as set forth above (the "Final Secured Party Revenue Participation"), it being understood that the Secured Party shall receive the Final Secured Party Revenue Participation for so long as Camelot receives Camelot Revenue from exploiting the Liberation Assets. In the event of a sale of all or a portion of the Liberation Assets to a third party during the Initial Period, the Secured Party shall receive ten percent (10%) of the monies received by Camelot from such sale; provided, however, that if such sale occurs after the Initial Period, then the Secured Party shall receive two and one-half percent (2.5%) of the monies received by Camelot from such sale. Payments shall be made payable to Incentive Capital, LLC.

(b)   Debtor shall render detailed statements (including, without limitation, an accounting of all revenue and expenses related to the disposition or other exploitation of the Collateral and its several parts) to the Secured Party on a quarterly basis, commencing as of the end of the first quarter in which Debtor receives any Camelot Revenue. Each statement shall be delivered to Secured Party within sixty (60) days after the end of the applicable quarter, accompanied with payment of the applicable amount, if any, shown due to Secured Party. In addition to the quarterly detailed accounting of Camelot Revenue and expenses, Debtor shall provide to Secured Party on a monthly basis a general statement indicating the total gross revenues received for or in connection with the disposition or other exploitation of the Collateral for the previous month. Debtor will maintain accurate records in local currency of all financial records regarding Camelot Revenue using generally accepted accounting principles on a consistent, uniform and nondiscriminatory basis until three (3) years after each such statement and during any period while a dispute about payments remains unresolved. Such records will include all receipts derived, all recoupable expenses paid, and all other information necessary to render any statement due. Debtor will also maintain full and accurate copies of every statement, contract, electronic record, audit report, correspondence and other records relating to the Camelot Revenue, and shall make available such records for inspection and copying by Secured Party at the Debtor's principal place of business during normal business hours.

-2-



(e)   The Secured Party, on thirty (30) days prior written notice, may examine and copy, through its auditors, Debtor's financial records regarding Camelot Revenue twice only in any year period. Such examination shall be at the Secured Party's expense unless it uncovers an underpayment, uncontested or later determined due, of more than ten percent (10%) of the amount shown due Secured Party on the statements, in which case Debtor shall pay on demand the reasonable costs of such examination.

3.   Security for Obligations.   This Security Agreement secures, and the Collateral, including the Liberation Assets, is collateral security for, the prompt payment or performance in full when due, whether at stated maturity, by acceleration or otherwise (including the payment of amounts which would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. Section 362(a)), to Secured Party of Debtor's indebtedness and other obligations now existing or hereafter arising to Secured Party with respect to the Note, whether for principal or interest (including, without limitation, interest which, but for the filing of a petition in bankruptcy, would accrue on such obligations) or payments of fees, expenses or otherwise pursuant to the Note and/or any other documents or instrument executed pursuant thereto or hereto (all such obligations being the "Note").

4.   Actions to Perfect.   Debtor hereby authorizes Secured Party at any time and from time to time to file one or more financing or continuation statements describing the Collateral. Debtor further agrees that at any time and from time to time, at the expense of the Debtor, Debtor will promptly execute and deliver all further instruments and documents, and take all further action that may be reasonably necessary or desirable, or that Secured Party may reasonably request, in order to perfect and protect any security interest granted or purported to be granted hereby or to enable Secured Party to exercise and enforce its rights and remedies hereunder with respect to any Collateral. Such actions may include, without limitation, the delivery to Secured Party of Collateral for which delivery is required to perfect, the signature by bailees or depository banks on control agreements in favor of Secured Party with respect to Collateral in the possession of bailees, or complying with the provisions of any applicable statutes governing perfection or protection of the security interest granted hereby in the Collateral.

5.   Representations and Warranties.   Debtor represents and warrants as follows:

(a)   Status of Debtor; Authorization.   Debtor (i) is a corporation duly organized, validly existing and in good standing under the laws of the state of Nevada, and (ii) is duly qualified or licensed to conduct business in each jurisdiction in which the nature of its business or assets requires such qualification or licensing under applicable law except where the failure to be so qualified would not have a material adverse effect on the business, operations or financial condition of Debtor. Debtor has the requisite power and authority to own its assets and to transact the business in which it is presently engaged and in which it proposes to engage and to grant to Secured Party the security interests in the Collateral as herein provided. Debtor has taken all action necessary to authorize the

- 3 -



execution and delivery of the Note and this Security Agreement, and the consummation of the transactions contemplated thereby and hereby.

(b)     Binding Security Agreement. This Security Agreement constitutes the legal, valid and binding agreement and obligation of Debtor, enforceable against Debtor in accordance with its terms, except as enforceability may be limited by the bankruptcy, insolvency, fraudulent conveyance, and similar laws and equitable principles affecting the enforcement of creditors' rights generally.

(c)     Title to Collateral. Except as otherwise expressly acknowledged and contemplated in the Purchase Agreement, such Debtor has good and marketable title to all and every part of the Collateral, free and clear of any mortgage, pledge, lien, security interest, encumbrance, conditional sale contract or other title retention agreement, or any other adverse claim of any nature whatsoever (collectively, "Lien") except for (x) the first priority security interest granted to the Secured Party hereby; and (y) the second priority security interest granted to CMBG as provided for in the Asset Purchase Agreement (referred to herein collectively as the "Permitted Liens"). No effective financing statement or other instrument similar in effect covering all or any part of the Collateral is on file in any recording office, except such as may have been filed with respect to the Permitted Liens.

(d)     No Default or Required Consent. Except as otherwise expressly acknowledged and contemplated in the Asset Purchase Agreement, the execution, delivery and performance of this Security Agreement by Debtor, and the effectuation by the Secured Party of any of its rights and remedies thereunder or hereunder, whether upon default or otherwise, (x) will not result in a breach of or constitute a default under (i) the certificate of incorporation or bylaws or other charter provision of Debtor, or (ii) any other agreement or instrument to which Debtor is a party or by which any of the Collateral is bound except, in the case of clause (ii), where such breach or default would not have a material adverse effect on the Collateral or on the business, operations or financial condition of Debtor, (y) will not violate any law or any rule or regulation of any administrative agency or any order, writ, injunction or decree of any court or administrative agency, and (z) does not require the consent of any person, entity or governmental agency or any notice or filing with any governmental or regulatory body, except as shall have been previously obtained, given or made or where the failure to obtain such consent would not have a material adverse effect on the Collateral or on the business, operations or financial condition of Debtor.

(e)     Perfection. Debtor's exact legal name, type of organization and jurisdiction of organization is set forth in the introduction of this Security Agreement. Debtor's organizational identification number is NV20071127932. Debtor's principal place of business is located at the address set forth on the date hereof in Section 14 of this Security Agreement. Upon (i) the execution and delivery of this Security Agreement by Debtor; and (ii) the proper and timely filing of a financing statement with the Secretary of State of Nevada, the Secured Party will have a first perfected first priority security interest in and to the Collateral.

- 4 -

(f)   Employment of Jamie Thompson:  Camelot Distribution Group, Inc.
("CDG") has entered into an employment agreement with Jamie Thompson
("Thompson") as of September 1, 2009 (the "Employment Agreement"),  whereunder
Thompson shall render services as President of CDG to, among other responsibilities,
manage and supervise CDG's general business operations, including without limitation
services in connection with the exploitation of the Liberation Assets.  Debtor hereby
acknowledges and agrees that it shall use its best efforts to continue Thompson's
Employment Agreement for a period of five (5) years from the date hereof.  During said
period of the Employment Agreement, Thompson shall be primarily responsible for the
exploitation of the Collateral.

6.   Affirmative Covenants.  Debtor covenants and agrees that until such time as
the Note is indefeasibly paid or otherwise satisfied in full, unless the Secured Party shall
otherwise consent in writing:

(a)   Conduct of Business and Maintenance of Assets and Licenses.
Debtor shall do or cause to be done all things reasonably necessary to preserve in full
force and effect its existence, its corporate powers and authority, its qualifications to carry
on business in all applicable jurisdictions, and all rights, interests and assets necessary to
the conduct of its business, except where the failure to do so does not have a material
adverse effect on the financial condition or operations of Debtor.

(b)   Protection of Security and Legal Proceedings.   Subject to the
provisions of Section 6.5 of the Purchase Agreement pursuant to which the Secured Party
expressly understands and acknowledges that Debtor may have no obligation to defend
adverse claims with respect to, and certain items of the Collateral may be sold, assigned or
abandoned by Debtor as Debtor may determine in its sole discretion, Debtor shall, at its
own expense, take any and all actions reasonably necessary to preserve, protect and
defend the security interests of the Secured Party in the Collateral and the perfection and
priority thereof against any and all adverse claims, including appearing in and defending all
actions and proceedings which purport to affect any of the foregoing.  Debtor shall promptly
reimburse the Secured Party for any and all sums, including costs, expenses and actual
attorneys' fees, which the Secured Party may pay or incur in defending, protecting or
enforcing its security interest in the Collateral or the perfection or priority thereof.

(c)   Payment of Taxes.  Debtor shall pay or cause to be paid all taxes and
other levies with respect to the Collateral when the same become due and payable, except
for any taxes which are being diligently contested in good faith by appropriate proceedings
and for which appropriate reserves have been established.

(d)   Use and Maintenance of Collateral.  Debtor shall comply in all material
respects with all laws, statutes and regulations pertaining to its use and ownership of the
Collateral and its conduct of its business; maintain all of the Collateral in good condition,
reasonable wear and tear excepted, and keep accurate and complete books and records
pertaining to the Collateral in accordance with generally accepted accounting principles,
except where the failure to do any of the foregoing does not have a material adverse affect
on the Collateral or the Secured Party's rights therein.

- 5 -

(e) <u>Inspection</u>. Debtor shall give the Secured Party such information as may be reasonably requested concerning the Collateral and shall during regular business hours and upon reasonable notice during the continuance of an Event of Default, permit the Secured Party and its agents and representatives to have full access to and the right to examine, audit and make copies and abstracts from any and all of Debtor's books and records pertaining to the Collateral, to confirm and verify the value of the Collateral and to do whatever else the Secured Party reasonably may deem necessary or desirable to protect its interests. Furthermore, Debtor agrees to furnish promptly to the Secured Party such information regarding the financial condition or business of Debtor or the Collateral as the Secured Party may reasonably request, and all such information hereafter furnished to the Secured Party by Debtor will be true and correct in all material respects when furnished.

(f) <u>Notification</u>. Debtor shall notify the Secured Party in writing within ten (10) business days of the occurrence of any event which materially adversely affects the value of the Collateral, the ability of Debtor or the Secured Party to dispose of the Collateral or the rights and remedies of the Secured Party in relation thereto.

7. <u>Negative Covenants</u>. Debtor covenants and agrees that until such time as the Note is indefeasibly paid or otherwise satisfied in full, without the prior written consent of the Secured Party:

(a) <u>Sale or Hypothecation of Collateral</u>. Except as otherwise provided in Section 6.5 of the Purchase Agreement, Debtor shall not directly or indirectly, whether voluntarily, involuntarily, by operation of law or otherwise (i) sell, assign, license, transfer, exchange, lease, lend, grant any option with respect to or dispose of any of the Collateral or any of Debtor's rights therein, except for sales, assignments, licenses, transfers, exchanges, leases or loans in the ordinary course of the Debtor's business; nor (ii) create or permit to exist any lien on or with respect to any of the Collateral, other than Permitted Liens. The inclusion of "proceeds" as a component of the Collateral shall not be deemed a consent by the Secured Party to any sale, assignment, transfer, exchange, lease, loan, granting of an option with respect to or disposition of all or any part of the Collateral.

(b) <u>Change of Location or Name</u>. Debtor shall not, without giving to the Secured Party at least thirty (30) days' prior written notice (i) move its principal place of business; (ii) change its name, its trade or fictitious business name(s) or its organizational identification number; (iii) keep Collateral at locations other than its principal place of business, except as otherwise disclosed to Secured Party in writing; or (iv) change its type of organization, jurisdiction of organization or other legal structure.

8. <u>Secured Party Appointed Attorney-in-Fact</u>. Debtor hereby appoints the Secured Party as Debtor's attorney-in-fact with full authority in the place and stead of Debtor and in the name of Debtor or otherwise, from time to time in the Secured Party's sole and absolute discretion to take any action and to execute any instrument which the Secured Party may deem necessary or advisable to accomplish the purposes of this

-6-



Security Agreement. Debtor acknowledges that the foregoing grant of power of attorney is coupled with an interest and is irrevocable.

9.    Secured Party May Perform. If either Debtor fails to perform any agreement or covenant contained herein, then the Secured Party in its discretion may perform or cause the performance of such agreement or covenant, and the reasonable expenses of the Secured Party incurred in connection therewith shall be payable by the Debtor. However, nothing in this Security Agreement shall obligate Secured Party to act, nor shall the actions of Secured Party under this section be construed as a waiver or cure of any such failure.

10.    Remedies upon Default.

(a) "Event of Default" shall mean the occurrence of any of the following events:

i.    The failure to pay the Note when due.

ii.    The failure, refusal or neglect of Debtor to observe or perform for any reason any of the covenants, conditions, agreements or provisions contained in this Security Agreement or in any of the other agreements or instruments referenced herein or contemplated hereby (referred to herein individually as a "Loan Document" and collectively as the "Loan Documents") (other than the payment of the Note of which the failure to pay constitutes an Event of Default described in Section 9(a)i hereof) or to execute and deliver any documents, agreements or instruments reasonably requested by Secured Party hereunder or thereunder; provided that if such failure, refusal or neglect is capable of remedy within fifteen (15) days the Debtor shall be entitled to cure the same within fifteen (15) days of Debtor's receipt of written notice from Secured Party of the occurrence of such failure, refusal or neglect.

iii.    Any representation or warranty made by Debtor in any Loan Document or any report, certificate, financial statement or other instrument furnished by or on behalf of Debtor in connection with any Loan Document shall prove to have been false or misleading in any material respect.

iv.    Subject to the provisions of Section 6.5 of the Purchase Agreement, Secured Party shall cease to have valid and perfected first priority security interest at any time for any reason in the Collateral, or any portion thereof (subject to Permitted Liens).

v.    Subject to the provisions of Section 6.5 of the Purchase Agreement, if any judgment against Debtor or any of its property or assets which would or might materially adversely affect (a) its ability to perform its obligations under any Loan Document; and/or (b) the Collateral and/or the Secured Party's rights therein, remains unpaid, unstayed or undismissed for a period of more than forty-five (45) days.

vi.    Debtor shall be dissolved or shall sustain the loss, cancellation or forfeiture of its legal status or good standing by reason of any judicial, extrajudicial or

-7-

administrative proceedings or otherwise, or shall (a) apply for or consent to the appointment of a receiver, trustee or liquidator of Debtor or of all or a substantial part of Debtor's assets; (b) be unable to, or admit in writing its inability to, pay its debts as they mature; (c) make a general assignment for the benefit of creditors; (d) be adjudicated a bankrupt or insolvent; (e) file a voluntary petition in bankruptcy or a petition or an answer seeking reorganization or an arrangement for the benefit of creditors or take advantage of any insolvency law in its capacity as a debtor; (f) interpose an answer admitting the material allegations of the petition filed against Debtor in any bankruptcy, reorganization or insolvency proceedings; (g) take any action which would have the effect of dissolving Debtor; or (h) take any action for the purpose of effecting any of the foregoing.

vii.   Any (a) involuntary petition is filed against Debtor seeking to subject Debtor to any bankruptcy, insolvency or similar laws and such petition shall remain unstayed or not be withdrawn for a period of forty-five (45) days; or (b) an order, judgment or decree shall be entered against Debtor by any court of competent jurisdiction approving a petition seeking its reorganization or appointment of a receiver, trustee or liquidator of Debtor or of all or a substantial part of its assets and such order, judgment or decree shall continue and stay in effect for a period of forty-five (45) days.

(b)   If an Event of Default exists, the Secured Party may exercise one or more of the following rights and remedies at any time or times and without notice to or demand upon Debtor:

(i)   Declare the Note to be forthwith due and payable, whereupon the Note shall be accelerated and shall become immediately due and payable without presentation, demand or notice of any kind to the Debtor (all of which are hereby waived by Debtor ), except that if an Event of Default specified in Sections 9(a)(vi) and 9(a)(vii) shall occur, such acceleration shall be automatic and no declaration or other act of Secured Party shall be necessary to effect such acceleration;

(ii)   Proceed to protect and enforce the rights of Secured Party to payment of the Note and its rights to proceed against the Collateral and exercise its remedies whether by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision of any of the Loan Documents or any other legal or equitable right or remedy of Secured Party;

(iii)   In addition to those actions that may otherwise be permitted to be taken by Secured Party under any of the Loan Documents, with respect to the Collateral, take the following actions:

(a)   Collections, etc. Secured Party may demand, sue for, collect or receive, in the name of Secured Party or in the name of Debtor, or otherwise, any money or property at any time payable or receivable on account of or in exchange for, or make any compromise or settlement deemed desirable with respect to, any of the Collateral (but Secured Party shall be under no obligation to do so), or extend the time of payment, arrange for payment in installments, or otherwise modify the term of, or release, any of the

- 8 -



Collateral, without thereby incurring responsibility to discharge, or discharging, or otherwise affecting any liability of Debtor hereunder. Secured Party shall not be required to take any steps to preserve any rights against other parties to the Collateral. Secured Party may (but is not obligated to) make such payments and take all such actions as Secured Party deems necessary to protect its security interest in the Collateral and/or the value thereof, and Secured Party is hereby authorized (without limiting the general nature of the authority hereinabove conferred) to pay, purchase, contest or compromise any lien or encumbrance on the Collateral; and

(b)   Possession and Sale of Collateral, etc.  Secured Party may exercise in respect of the Collateral all rights and remedies hereunder and under the Loan Documents, all the rights and remedies of a secured party under the Code and all rights and remedies otherwise available to it. In addition, Secured Party may notify any and all account debtors of the Debtor to make all further payments to Secured Party, and enter upon each premises of wherever the Collateral may be and take possession of the Collateral and demand and receive such possession from any Person who has possession thereof; and take such measures as it may deem necessary or proper for the care or protection thereof, including the right to remove all or any portion of the Collateral (but Secured Party shall not be obligated to do so). With or without taking such possession, Secured Party may sell or cause to be sold, whenever Secured Party shall decide, in one or more sales or parcels, and at such price or prices and upon such other terms as may be commercially reasonable (irrespective of the impact of any such sales on the market price of such assets), and for cash or on credit or for future delivery, without assumption of any credit risk, all or any portion of the Collateral at any broker's board or at public or private sale. Secured Party may be the purchaser at any public or private sale to the extent permitted by law and provided such sale is conducted in accordance with the Code of any or all of the Collateral so sold and shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of such assets sold at any such public or private sale, to use and apply the Note as a credit on account of the purchase price payable by Secured Party at such sale. Each purchaser (including the Secured Party) at any such sales shall thereafter hold the Collateral purchased absolutely free from any claim or right of whatever kind, including any equity of redemption of the Debtor, any such demand, notice, claim, right and equity being hereby expressly waived and released. Debtor agree that, to the extent notice of sale shall be required by law, at least ten (10) days' notice of sale to the Debtor of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. Secured Party shall not be obligated to make any sale of the Collateral regardless of notice of sale having been given. Secured Party may adjourn any public or private sale from time to time by announcement at the time and place fixed therefore, and such sale may, without further notice be made at the time and place to which it was so adjourned. Debtor hereby waive any claims against Secured Party arising by reason of the fact that the price at which any Collateral may have been sold at such a private sale was less than the price which might have been obtained at a public sale, even if Secured Party accepts the first offer received and does not offer such Collateral to more than one offeree, provided such private sale is conducted in a commercially reasonable manner.

-9-

(c)    Appointment of a Receiver.  Upon the occurrence of an Event of Default, the Secured Party shall be entitled to the appointment of a receiver, to take possession of all or any portion of the Collateral and to exercise such powers as the court shall confer upon the receiver.

(d)    Power of Attorney.  Debtor does hereby irrevocably make, constitute, and appoint the Secured Party and its designees as its true and lawful attorney-in-fact, with full power in the name of Secured Party and/or Debtor, to take the following actions upon the occurrence of an Event of Default: to endorse any notes, checks, drafts, money orders or other evidences of payment relating to the Collateral that may come into the possession of the Secured Party; to enforce all of Debtor's rights under and pursuant to all agreements with respect to the Collateral, all for the sole benefit of Secured Party, to enter into and perform such agreements as may be necessary in order to carry out the terms, covenants, and conditions of this Security Agreement which are required to be observed or performed by Debtor, to execute such other and further mortgages, pledges and assignments of the Collateral as Secured Party may require for the purpose of protecting, maintaining, or enforcing the security interests granted to Secured Party by this Security Agreement and the other Loan Documents, and to do any and all other things necessary or proper to carry out the intention of this Security Agreement and the other Loan Documents; and Debtor hereby ratifies and confirms all the Secured Party, as such attorney-in-fact, or its substitutes shall properly do by virtue of this power of attorney, provided, however, that Secured Party agrees to notify Debtor prior to any such endorsement, execution or action and to provide Debtor with a reasonable period to endorse or execute the subject documents on Debtor's own behalf.  Such powers of attorney are coupled with an interest and are therefore irrevocable.

(e)    Rights and Remedies Cumulative.  No right or remedy conferred upon Secured Party herein or in any of the other Loan Documents or otherwise available at law or in equity (or both) shall be exclusive of any other right or remedy contained herein or therein or otherwise made available. All such rights and remedies are cumulative and are not exclusive of any right or remedy which Secured Party may otherwise have.

(f)    Application of Proceeds.  Any cash held by the Secured Party as Collateral and all cash proceeds received by either of the Secured Party in respect of any sale of, collection from, or other realization upon all or any part of the Collateral may, in the discretion of the Secured Party, be held by the Secured Party as collateral for, and/or then or at any time thereafter applied (after payment of any amounts payable to Secured Party pursuant to this Security Agreement) in whole or in part by the Secured Party against all or any part of the Note in such order as the Secured Party shall elect.  Any surplus of such cash or cash proceeds held by either of the Secured Party and remaining after payment in full of all the Note shall be paid over to Debtor or to whomsoever may be lawfully entitled to receive such surplus.

11.    Liability and Indemnification.  The powers conferred upon Secured Party

- 10 -

hereunder are solely to protect its interest in the Collateral and shall not impose any duty upon it to exercise such powers. Nothing in this Security Agreement shall be deemed to constitute an assumption by either of the Secured Party of any liability or obligation of the Debtor with respect to any of the Collateral. The Secured Party shall not be liable to either Debtor for any act (including, without limitation, any act of active negligence) or omission by the Secured Party under this Security Agreement unless the Secured Party's conduct constitutes willful misconduct or gross negligence. Debtor agrees to indemnify and to hold the Secured Party harmless from and against all losses, liabilities, claims, damages, costs and expenses (including reasonable attorneys' fees and disbursements) with respect to (a) any action taken (including, without limitation, any act of active negligence) or any omission by either of the Secured Party with respect to the Payment Obligations or this Security Agreement, provided that Secured Party's conduct does not constitute willful misconduct or gross negligence, and (b) any claims arising out of Debtor's ownership of the Collateral or Secured Party's security interest therein.

12. <u>Expenses.</u> Debtor agrees to pay upon demand to the Secured Party any and all reasonable expenses, including the reasonable fees and expenses of its outside counsel and of any experts and agents which the Secured Party may incur in connection with (a) the custody or preservation of, or the sale of, collection from, or other realization upon, any of the Collateral, (b) the exercise or enforcement of any of the rights of the Secured Party under the Payment Obligation and/or this Security Agreement, and (c) the failure by Debtor to perform or observe any of the provisions of the Payment Obligation and/or this Security Agreement.

13. <u>Security Interest Absolute.</u> Except as otherwise provided herein or in the Purchase Agreement or in the Intercreditor Agreement, all rights of the Secured Party and security interests hereunder shall be absolute and unconditional irrespective of:

(a)   any lack of validity or enforceability of the Purchase Agreement or any other Loan Document;

(b)   any change in the time, manner or place of payment of, or in any other term of, all or any of the Note, or any other amendment or waiver of or any consent to any departure from any of the Loan Documents; or

(c)   any furnishing, exchange, release or non-perfection of any other collateral, or any release or amendment or waiver of or consent to departure from any guaranty for all or any of the Note.

14. <u>Amendments, Waiver.</u> No amendment or waiver of any provision of this Security Agreement nor consent to any departure by Debtor herefrom shall in any event be effective unless the same shall be in writing and signed by the Secured Party and Debtor and/, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose any party for which given.

- 11 -

15.    Notices.  All notices, requests, demands and other communications required or permitted to be given hereunder shall be in writing and shall be deemed to have been duly given if delivered by messenger or overnight delivery service, or sent by first class mail (or air mail where available), postage prepaid, certified or registered, return receipt requested, as set forth in the Purchase Agreement or at such other address as may be furnished in writing.  Any notice given by messenger or overnight delivery service as provided in this Section 15 shall be deemed given when delivered if during normal business hours on a business day (or if not, the next business day after delivery); any notice given by first class mail (or air mail where available), postage prepaid, certified or registered, return receipt requested shall be deemed given five (5) business days after the date of mailing.  Any party may by notice to the other change the address at which notices and demands may be given to it.

16.    Continuing Security Interest; Release of Security Interest Upon Payment. This Security Agreement shall create a continuing security interest in the Collateral and shall (a) remain in full force and effect until indefeasible payment or other satisfaction in full of the Note, (b) be binding upon Debtor, and its successors and assigns, (c) inure, together with the rights and remedies of the Secured Party hereunder, to the benefit of the Secured Party and its successors, transferees and assigns, (d) constitute the entire agreement between Debtor and the Secured Party with respect to the subject matters covered hereby, and (e) be severable in the event that one or more of the provisions herein is determined to be illegal or unenforceable.  Upon the indefeasible payment or other satisfaction in full of the Note, the Secured Party, at the request and expense of Debtor, shall release the security interests in the Collateral granted herein and execute such termination statements as may be necessary therefore, to the extent that such Collateral shall not have been sold or otherwise applied pursuant to the terms hereof.

17.    Return of Collateral.  Subject to any duty imposed by law or otherwise to the holder of any subordinate lien on the Collateral known to the Secured Party, and subject to the direction of a court of competent jurisdiction, upon payment in full of the Note, Debtor shall be entitled to the return of all Collateral belonging to Debtor in the possession of the Secured Party; provided, however, that the Secured Party shall not be obligated to return to Debtor or deliver to the holder of any subordinate lien any such Collateral until it is satisfied that all amounts with respect to the Note are no longer subject to being recaptured under applicable bankruptcy or insolvency laws or otherwise.  The return of Collateral, however effected, shall be without recourse to the Secured Party and the Secured Party shall be entitled to receive appropriate documentation to such effect. The return of Collateral shall be effected without representation or warranty and shall not entitle Debtor to any right to any endorsement.

18.    Governing Law; Terms.  This Security Agreement shall be deemed to have been made in the state of Utah and the validity, construction, interpretation, and enforcement hereof, and the rights of the parties hereto, shall be determined under, governed by, and construed in accordance with the internal laws of the state of Utah. Debtor hereby consents to the jurisdiction of any Utah state or United States Federal court sitting in Utah with respect to disputes arising out of this Security Agreement.

- 12 -

19.   Waiver of Jury Trial. Debtor HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY.   Any legal action or proceeding with respect to this Security Agreement must be brought in the federal or state courts located in the State of Utah, unless Secured Party elects to bring such legal action or proceeding elsewhere. Debtor hereby irrevocably accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the federal or state courts located in the State of Utah as having proper venue. Debtor hereby irrevocably waives any objection which it may now or hereafter have to the laying of venue of any of the aforesaid actions or proceedings arising out of or in connection with this Security Agreement brought in the aforesaid Utah courts and irrevocably waives and agrees not to plead or claim in any such court that any such action or proceeding brought in any such court has been brought in an inconvenient forum, and also consents to the service of process by any means authorized by the State of Utah.

IN WITNESS WHEREOF, the parties hereto have caused this Security Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first above written.

Debtor:
CAMELOT FILM GROUP, INC., a Nevada corporation

By: _____
      Robert P. Atwell, CEO

Secured Party:
INCENTIVE CAPITAL, LLC, a Utah corporation

By: _____
                              , President



- 13 -

**EXHIBIT E**

# COMMERCIAL GUARANTY

**THIS COMMERCIAL GUARANTY** (as the same may from time to time be amended, restated or otherwise modified, "*Guaranty*") is made as of the 27ᵗʰ day of April, 2010, by CAMELOT DISTRIBUTION GROUP, INC., a Delaware corporation in good standing in the State of California, with a place of business at 10 Universal City Plaza NBC/Universal Building, 20ᵗʰ Floor, Universal City, CA 91608, and its successors and assigns ("*Guarantor*"), in order to induce INCENTIVE CAPITAL, LLC, a Utah limited liability company with offices at 2755 E. Cottonwood Parkway, Suite 100, Salt Lake City, UT 84121, and its successors and assigns ("*Lender*") to extend credit (the "*Loan*") to CAMELOT FILM GROUP, INC., a Nevada corporation in good standing in the State of California, with a place of business at 10 Universal City Plaza NBC/Universal Building, 20ᵗʰ Floor, Universal City, CA 91608, and its successors and assigns ("*CFG*") ("*CFG*", also referred to herein as the "*Borrower*"), and in consideration thereof, and other good and valuable consideration, hereby unconditionally and absolutely guarantees the punctual and full performance of all Obligations (as hereinafter defined) of CFG to Lender.

As used herein, "*Obligations*" means every liability, now or hereafter owing to Lender or any affiliate of Lender ("*Lender Affiliate*") by Borrower, and includes, without limitation, every liability, whether owing by only Borrower or by Borrower with one or more others in a several, joint or joint and several capacity, whether owing absolutely or contingently, whether created by note, overdraft, guaranty of payment or other contract, or by a quasi-contract, tort, statute or other operation of law, whether incurred directly to Lender or acquired by Lender by purchase, pledge or otherwise and whether participated to or from Lender in whole or in part and all costs and expenses, including attorneys' fees, incurred by Lender in connection with the collection of any portion of the indebtedness. Any capitalized terms used but not defined herein shall have the meaning assigned it in that certain Promissory Note of even date herewith between Lender and Borrower (the "*Note*").

Guarantor deems it to be in the direct pecuniary and business interests of Guarantor that Lender extend credit to Borrower and understands that Lender is willing to extend credit to Borrower only upon certain terms and conditions, one of which is that Guarantor guarantee the payment of the Obligations, and this Guaranty is being executed and delivered in consideration of Lender extending credit to Borrower and for other valuable consideration. Guarantor acknowledges that the consideration for this Guaranty is not a mere recital and is adequate regardless of actual amount.

**Unconditional Guaranty.** Subject to the collection priority provisions contained hereinbelow, Guarantor hereby absolutely and unconditionally guarantees the prompt payment in full of all of the Obligations as and when the respective parts thereof become due and payable. Notwithstanding any provision to the contrary contained in this Guaranty or in any other Guaranty held by Lender guaranteeing the Obligations, Lender agrees that it shall seek satisfaction of the Obligations in the following order of priority: First, from the Borrower; Second, from the Guarantor hereunder, pursuant to this Guaranty; Third, from Camelot Entertainment Group, Inc pursuant to its Commercial Guaranty of the Obligations; and Fourth,

1

from Robert P. Atwell, pursuant to his Guaranty of the Obligations.  If the Obligations, or any part thereof, shall not be paid in full when due and payable, then the Lender shall have the right to proceed directly against the Borrower and the various Guarantors in the foregoing order of priority to collect the payment in full of the Obligations. This is a guaranty of payment and not merely a guaranty of collection, and Guarantor hereby waives each and every guarantorship and suretyship defense, generally unless otherwise herein agreed. The "*Obligor*" means any entity, or any of its property, that is or shall be obligated on the Obligations or any part thereof in any manner and includes, without limitation, Borrower or Guarantor, and any other co-maker, endorser, guarantor of payment, subordinating creditor, assignor, grantor of a security interest, pledgor, mortgagor or any hypothecator of property. "*Collateral*" means, collectively, all property securing the Obligations or any part thereof at the time in question.

**Payments.**  Whenever Lender shall credit any payment to the Obligations or any part thereof, whatever the source or form of payment, the credit shall be conditional as to Guarantor unless and until the payment shall be final and valid as to all the world.  Without limiting the generality of the foregoing, Guarantor agrees that if any check or other instrument so applied shall be dishonored by the drawer or any party thereto, or if any proceeds of Collateral or payment so applied shall thereafter be recovered by any trustee in bankruptcy or any other person, Lender, in each case, may reverse any entry relating thereto on its books and Guarantor shall remain liable therefore.

**Continuing Guaranty.**  Regardless of the duration of time, and irrespective of any act, omission or course of dealing whatever on the part of Lender, Guarantor's liabilities and other obligations under this Guaranty shall remain in full effect until the payment in full of the Obligations.  Without limiting the generality of the foregoing:

(a)     Lender shall not at any time be under any duty to Guarantor to grant any financial accommodation to Borrower, irrespective of any duty or commitment, if any, of Lender to Borrower, or to follow or direct the application of the proceeds of any such financial accommodation except to the extent otherwise provided herein.

(b)     Guarantor waives (i) notice of the incurring of any Obligations by Borrower or the terms and conditions thereof, (ii) presentment, demand for payment and notice of dishonor of the Obligations or any part thereof, or any other indebtedness incurred by Borrower to Lender, and (iii) notice of any indulgence granted to any Obligor However, Guarantor does not waive any other notice to which Guarantor might be entitled, and Lender hereby agrees to provide such notices to Guarantor.

(c)     Lender, in its sole discretion, may, without any prejudice to its rights under this Guaranty, at any time or times, without notice to or the consent of Guarantor, and provided any such action does not materially adversely affect Lender's obligation to seek payment of the Obligations in the order of priorities set forth hereinabove, (i) grant Borrower whatever financial accommodations that Lender may from time to time deem advisable, even if Borrower might be in default in any respect and even if those financial accommodations might not constitute indebtedness the payment of which is guaranteed hereunder; (ii) assent to any renewal, extension,

2



consolidation or refinancing of the Obligations or any part thereof; (iii) grant any waiver or consent or forbear from exercising any right, power or privilege that Lender may have or acquire; (iv) assent to any amendment, deletion, addition, supplement or other modification in, to or of any writing evidencing or securing any Obligations or pursuant to which any Obligations are created; (v) grant any other indulgence to any Obligor; or (vi) accept any Collateral for, or any other Obligor upon, the Obligations or any part thereof.

(d)     Guarantor's liabilities and other obligations under this Guaranty shall be absolute and unconditional subject to the Lender's obligation to seek payment of the Obligations in the order of priorities set forth hereinabove.

**Warranties.**  Guarantor represents and warrants that (a) Guarantor has legal power and right to execute and deliver this Guaranty and to perform and observe the provisions hereof; (b) this Guaranty, when executed, is legal and binding upon Guarantor in every respect; (c) no litigation or proceeding is pending or threatened against Guarantor before any court or any administrative agency that would materially adversely affect Guarantor's obligations to the Lender hereunder; (d) Guarantor has received consideration that is the reasonable equivalent value of the obligations and liabilities that Guarantor has incurred to Lender; (e) Guarantor is not insolvent, as defined in any applicable state or federal statute, nor will Guarantor be rendered insolvent by the execution and delivery of this Guaranty to Lender; and (f) Guarantor does not intend to, nor does Guarantor believe that Guarantor will, incur debts beyond Guarantor's ability to pay such debts as they mature.

**Solvency of Obligor.**  Without limiting the generality of any of the other provisions hereof, Guarantor specifically agrees that upon the dissolution of any Obligor and/or the filing or other commencement of any bankruptcy or insolvency proceedings by, for or against any Obligor, including without limitation, any assignment for the benefit of creditors or other proceedings intended to liquidate or rehabilitate any Obligor, and if the Borrower and other Obligors as the case may be are not paying the Obligations pursuant to the terms of the Note in the order of priorities set forth in this Guaranty, then Lender, in its sole discretion, may declare the unpaid principal balance of and accrued interest on the Obligations to be forthwith due and payable in full without notice.  Upon the occurrence of any of the events enumerated in the immediately preceding sentence, Guarantor shall, upon Lender's demand, whenever made, pay to Lender an amount equal to the then unpaid principal balance of and accrued interest on the Obligations.

**Waiver.**  To the extent permitted by law, Guarantor waives any claim or other right that Guarantor might now have or hereafter acquire against Borrower or any other Obligor that arises from the existence or performance of Guarantor's liabilities or other obligations under this Guaranty, including, without limitation, any right of subrogation, exoneration, indemnification, and any right to participate in any claim or remedy of Lender against Borrower or any Collateral that Lender now has or hereafter acquires, whether or not such claim, remedy or right arises in equity, or under contract, statute or common law.



3

**Notices.** All notices, requests, demands and other communications provided for hereunder shall be in writing and mailed or delivered at the address specified on the front page of this Guaranty. All notices, statements, requests, demands and other communications provided for hereunder shall be deemed to be given or made when delivered or forty-eight (48) hours after being deposited in the mails with postage prepaid by registered or certified mail, addressed as aforesaid, or sent by facsimile with telephonic confirmation of receipt, except that notices from Guarantor to Lender pursuant to any of the provisions hereof shall not be effective until received by Lender.

**Successors and Assigns.** This Guaranty shall bind Guarantor and Guarantor's successors and assigns and shall inure to the benefit of Lender and its successors and assigns, including (without limitation) each holder of any note evidencing any Obligations. If, at any time, one or more provisions of this Guaranty is or becomes invalid, illegal or unenforceable in whole or in part, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby. This Guaranty constitutes a final written expression of all of the terms of this Guaranty, is a complete and exclusive statement of those terms and supersedes all oral representations, negotiations and prior writings, if any, with respect to the subject matter hereof. The relationship between Guarantor and Lender with respect to this Guaranty is and shall be solely that of debtor and creditor, respectively, and, except as otherwise provided herein, Lender shall have no fiduciary obligation toward Guarantor with respect to this Guaranty or the transactions contemplated hereby; provided, however, that Lender shall have an obligation to act in good faith toward Guarantor with respect to this Guaranty or the transactions contemplated hereby.

**Collateral.** This Guaranty is secured by all of the collateral described in the Security Agreement of even date herewith between Borrower and Lender.

**Independent Judgment.** Guarantor (a) warrants that Guarantor has not relied on any information about the Borrower, the Collateral, or any other Obligor provided directly or indirectly by Lender; (b) warrants that Guarantor is familiar with Borrower, Borrower's affairs, and the Collateral; (c) warrants that Guarantor has been provided with all information concerning Borrower, Borrower's affairs, and the Collateral that Guarantor has requested; (d) warrants that Guarantor has had adequate opportunity to seek and evaluate professional advice concerning Borrower, the Collateral, and this Guaranty from advisors of Guarantor's choosing, including financial and legal advice; (e) agrees that Lender has no obligation to provide Guarantor any information about the Borrower, any Obligor, or the Collateral; and (f) agrees that Guarantor may not rely on any information about Borrower, any Obligor, or the Collateral provided by Lender.

**Set Off.** Guarantor: (a) agrees that upon the occurrence and continuation of an event of default under the Obligations which is not waived by the Lender, Lender has the right, in addition to all other rights and remedies available to it, to set off the unpaid balance of the Obligations against any debt owing to Guarantor by Lender; (b) hereby grants, pledges, and assigns to Lender a security interest in, and lien upon, all cash, negotiable instruments, securities, deposit accounts, and other cash equivalents, whether collected or in the process of collection, whether matured or

4



unmatured, now or hereafter in the possession of Lender and upon which Guarantor has or may hereafter have any claim; and (c) agrees, to the fullest extent Guarantor may effectively do so under applicable law, that any holder of a participation in the Obligations, with the exception of the applicable bank(s) which is (are) a holder(s) of a participation in the Obligations by virtue of its banking relationship with Guarantor on unrelated accounts, may exercise rights of set-off or counterclaim and other rights with respect to such participation as fully as if such holder of a participation were a direct creditor of Guarantor pursuant to this Guaranty in the amount of such participation.

**Savings Clause.** Notwithstanding anything to the contrary herein, the Guarantor's obligations hereunder shall not exceed the maximum amount that would not be subject to avoidance under fraudulent conveyance, fraudulent transfer, and other similar laws.

**Governing Law.** The provisions of this Guaranty and the respective rights and duties of Guarantor and Lender hereunder shall be governed by and construed in accordance with Utah law and any applicable federal laws. Guarantor hereby irrevocably submits to the non-exclusive jurisdiction of any Utah state or federal court sitting in Salt Lake County, over any action or proceeding arising out of or relating to this Guaranty, or any document related to the Obligations, and Guarantor hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such Utah state or federal court. The Guarantor hereby waives any objection that it may now or hereafter have to the venue of any such suit or any such court or that such suit is brought in an inconvenient court.

Executed as of the date set forth above.        **CAMELOT DISTRIBUTION GROUP, INC.**

BY: _____

Robert P. Atwell, CEO



5

**EXHIBIT F**

# COMMERCIAL GUARANTY

**THIS COMMERCIAL GUARANTY** (as the same may from time to time be amended, restated or otherwise modified, "*Guaranty*") is made as of the 27th day of April, 2010, by **CAMELOT ENTERTAINMENT GROUP, INC.**, a Delaware corporation, having a usual place of business at 8001 Irvine Center Drive, Suite 400, Irvine, California 92618, and its successors and assigns ("*Guarantor*"), in order to induce **INCENTIVE CAPITAL, LLC**, a Utah limited liability company with offices at 2755 E. Cottonwood Parkway, Suite 100, Salt Lake City, UT 84121, and its successors and assigns ("*Lender*") to extend credit (the "*Loan*") to **CAMELOT FILM GROUP, INC.**, a Nevada corporation in good standing in the State of California, with a place of business at 10 Universal City Plaza NBC/Universal Building, 20th Floor, Universal City, CA 91608, and its successors and assigns ("*CFG*", also referred to herein as the "*Borrower*"), and in consideration thereof, and other good and valuable consideration, hereby unconditionally and absolutely guarantees the punctual and full performance of all Obligations (as hereinafter defined) of CFG to Lender. 

As used herein, "*Obligations*" means every liability, now or hereafter owing to Lender or any affiliate of Lender ("*Lender Affiliate*") by Borrower, and includes, without limitation, every liability, whether owing by only Borrower or by Borrower with one or more others in a several, joint or joint and several capacity, whether owing absolutely or contingently, whether created by note, overdraft, guaranty of payment or other contract, or by a quasi-contract, tort, statute or other operation of law, whether incurred directly to Lender or acquired by Lender by purchase, pledge or otherwise and whether participated to or from Lender in whole or in part and all costs and expenses, including attorneys' fees, incurred by Lender in connection with the collection of any portion of the indebtedness. Any capitalized terms used but not defined herein shall have the meaning assigned it in that certain Promissory Note of even date herewith between Lender and Borrower (the "*Note*").

Guarantor deems it to be in the direct pecuniary and business interests of Guarantor that Lender extend credit to Borrower and understands that Lender is willing to extend credit to Borrower only upon certain terms and conditions, one of which is that Guarantor guarantee the payment of the Obligations, and this Guaranty is being executed and delivered in consideration of Lender extending credit to Borrower and for other valuable consideration. Guarantor acknowledges that the consideration for this Guaranty is not a mere recital and is adequate regardless of actual amount.

**Unconditional Guaranty.**   Subject to the collection priority provisions contained hereinbelow, Guarantor hereby absolutely and unconditionally guarantees the prompt payment in full of all of the Obligations as and when the respective parts thereof become due and payable. Notwithstanding any provisions to the contrary contained in this Guaranty or in any other Guaranty held by Lender guaranteeing the Obligations, Lender agrees that it shall seek satisfaction of the Obligations in the following order of priority: First, from the Borrower; Second, from Camelot Distribution Group, Inc. pursuant to its Commercial Guaranty of the Obligations; Third, from the Guarantor hereunder, pursuant to this Guaranty; and Fourth from Robert P. Atwell pursuant to his personal Guaranty of the Obligations. If the Obligations, or any

1

part thereof, shall not be paid in full when due and payable, then the Lender shall have the right
to proceed directly against the Borrower and the various Guarantors in the foregoing order of
priority to collect the payment in full of the Obligations. This is a guaranty of payment and not
merely a guaranty of collection, and Guarantor hereby waives each and every guarantorship and
suretyship defense, generally unless otherwise herein agreed. The "*Obligor*" means any entity, or
any of its property, that is or shall be obligated on the Obligations or any part thereof in any
manner and includes, without limitation, Borrower or Guarantor, and any other co-maker,
endorser, guarantor of payment, subordinating creditor, assignor, grantor of a security interest,
pledgor, mortgagor or any hypothecator of property. "*Collateral*" means, collectively, all
property securing the Obligations or any part thereof at the time in question.

    **Payments.**  Whenever Lender shall credit any payment to the Obligations or any part
thereof, whatever the source or form of payment, the credit shall be conditional as to Guarantor
unless and until the payment shall be final and valid as to all the world. Without limiting the
generality of the foregoing, Guarantor agrees that if any check or other instrument so applied
shall be dishonored by the drawer or any party thereto, or if any proceeds of Collateral or
payment so applied shall thereafter be recovered by any trustee in bankruptcy or any other
person, Lender, in each case, may reverse any entry relating thereto on its books and Guarantor
shall remain liable therefore.

    **Continuing Guaranty.**  Regardless of the duration of time, and irrespective of any act,
omission or course of dealing whatever on the part of Lender, Guarantor's liabilities and other
obligations under this Guaranty shall remain in full effect until the payment in full of the
Obligations. Without limiting the generality of the foregoing:

    (a)    Lender shall not at any time be under any duty to Guarantor to grant any financial
accommodation to Borrower, irrespective of any duty or commitment, if any, of Lender to
Borrower, or to follow or direct the application of the proceeds of any such financial
accommodation except to the extent otherwise provided herein.

    (b)    Guarantor waives (i) notice of the incurring of any Obligations by Borrower or the
terms and conditions thereof, (ii) presentment, demand for payment and notice of dishonor of the
Obligations or any part thereof, or any other indebtedness incurred by Borrower to Lender, and
(iii) notice of any indulgence granted to any Obligor. However, Guarantor does not waive (any
other notice to which Guarantor might be entitled, and Lender hereby agrees to provide such
notices to Guarantor.

    (c)    Lender, in its sole discretion, may, without any prejudice to its rights under this
Guaranty, at any time or times, without notice to or the consent of Guarantor, and provided any
such action does not materially adversely affect Lender's obligation to seek payment of the
Obligations in the order of priorities set forth hereinabove, (i) grant Borrower whatever financial
accommodations that Lender may from time to time deem advisable, even if Borrower might be
in default in any respect and even if those financial accommodations might not constitute
indebtedness the payment of which is guaranteed hereunder; (ii) assent to any renewal, extension,
consolidation or refinancing of the Obligations or any part thereof; (iii) grant any waiver or

2



consent or forbear from exercising any right, power or privilege that Lender may have or acquire; (iv) assent to any amendment, deletion, addition, supplement or other modification in, to or of any writing evidencing or securing any Obligations or pursuant to which any Obligations are created; (v) grant any other indulgence to any Obligor; or (vi) accept any Collateral for, or any other Obligor upon, the Obligations or any part thereof.

(d)      Guarantor's liabilities and other obligations under this Guaranty shall be absolute and unconditional subject to the Lender's obligation to seek payment of the Obligations in the order of priorities set forth hereinabove.

**Warranties.**  Guarantor represents and warrants that (a) Guarantor has legal power and right to execute and deliver this Guaranty and to perform and observe the provisions hereof; (b) this Guaranty, when executed, is legal and binding upon Guarantor in every respect; (c) no litigation or proceeding is pending or threatened against Guarantor before any court or any administrative agency that would materially adversely affect Guarantor's obligations to the Lender hereunder; (d) Guarantor has received consideration that is the reasonable equivalent value of the obligations and liabilities that Guarantor has incurred to Lender; (e) Guarantor is not insolvent, as defined in any applicable state or federal statute, nor will Guarantor be rendered insolvent by the execution and delivery of this Guaranty to Lender; and (f) Guarantor does not intend to, nor does Guarantor believe that Guarantor will, incur debts beyond Guarantor's ability to pay such debts as they mature.

**Solvency of Obligor.**  Without limiting the generality of any of the other provisions hereof, Guarantor specifically agrees that upon the dissolution of any Obligor and/or the filing or other commencement of any bankruptcy or insolvency proceedings by, for or against any Obligor, including without limitation, any assignment for the benefit of creditors or other proceedings intended to liquidate or rehabilitate any Obligor, and if the Borrower and other Obligors as the case may be are not paying the Obligations pursuant to the terms of the Note in the order of priorities set forth in this Guaranty, then Lender, in its sole discretion, may declare the unpaid principal balance of and accrued interest on the Obligations to be forthwith due and payable in full without notice.  Upon the occurrence of any of the events enumerated in the immediately preceding sentence, Guarantor shall, upon Lender's demand, whenever made, pay to Lender an amount equal to the then unpaid principal balance of and accrued interest on the Obligations.

**Waiver.**  To the extent permitted by law, Guarantor waives any claim or other right that Guarantor might now have or hereafter acquire against Borrower or any other Obligor that arises from the existence or performance of Guarantor's liabilities or other obligations under this Guaranty, including, without limitation, any right of subrogation, exoneration, indemnification, and any right to participate in any claim or remedy of Lender against Borrower or any Collateral that Lender now has or hereafter acquires, whether or not such claim, remedy or right arises in equity, or under contract, statute or common law.

3

**Notices.**   All notices, requests, demands and other communications provided for hereunder shall be in writing and mailed or delivered at the address specified on the front page of this Guaranty.  All notices, statements, requests, demands and other communications provided for hereunder shall be deemed to be given or made when delivered or forty-eight (48) hours after being deposited in the mails with postage prepaid by registered or certified mail, addressed as aforesaid, or sent by facsimile with telephonic confirmation of receipt, except that notices from Guarantor to Lender pursuant to any of the provisions hereof shall not be effective until received by Lender.

**Successors and Assigns.**  This Guaranty shall bind Guarantor and Guarantor's successors and assigns and shall inure to the benefit of Lender and its successors and assigns, including (without limitation) each holder of any note evidencing any Obligations.  If, at any time, one or more provisions of this Guaranty is or becomes invalid, illegal or unenforceable in whole or in part, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.  This Guaranty constitutes a final written expression of all of the terms of this Guaranty, is a complete and exclusive statement of those terms and supersedes all oral representations, negotiations and prior writings, if any, with respect to the subject matter hereof. The relationship between Guarantor and Lender with respect to this Guaranty is and shall be solely that of debtor and creditor, respectively, and, except as otherwise provided herein, Lender shall have no fiduciary obligation toward Guarantor with respect to this Guaranty or the transactions contemplated hereby; provided, however, that Lender shall have an obligation to act in good faith toward Guarantor with respect to this Guaranty or the transactions contemplated hereby.

**Collateral.**  This Guaranty is secured by all of the collateral described in the Security Agreement of even date herewith between Borrower and Lender.

**Independent Judgment.**  Guarantor (a) warrants that Guarantor has not relied on any information about the Borrower, the Collateral, or any other Obligor provided directly or indirectly by Lender; (b) warrants that Guarantor is familiar with Borrower, Borrower's affairs, and the Collateral; (c) warrants that Guarantor has been provided with all information concerning Borrower, Borrower's affairs, and the Collateral that Guarantor has requested; (d) warrants that Guarantor has had adequate opportunity to seek and evaluate professional advice concerning Borrower, the Collateral, and this Guaranty from advisors of Guarantor's choosing, including financial and legal advice; (e) agrees that Lender has no obligation to provide Guarantor any information about the Borrower, any Obligor, or the Collateral; and (f) agrees that Guarantor may not rely on any information about Borrower, any Obligor, or the Collateral provided by Lender.

**Set Off.**  Guarantor:  (a) agrees that upon the occurrence and continuation of an event of default under the Obligations which is not waived by the Lender, Lender has the right, in addition to all other rights and remedies available to it, to set off the unpaid balance of the Obligations against any debt owing to Guarantor by Lender; (b) hereby grants, pledges, and assigns to Lender a security interest in, and lien upon, all cash, negotiable instruments, securities, deposit accounts, and other cash equivalents, whether collected or in the process of collection, whether matured or unmatured, now or hereafter in the possession of Lender and upon which Guarantor has or may

4



hereafter have any claim; and (c) agrees, to the fullest extent Guarantor may effectively do so under applicable law, that any holder of a participation in the Obligations, with the exception of the applicable bank(s) which is (are) a holder(s) of a participation in the Obligations by virtue of its banking relationship with Guarantor on unrelated accounts, may exercise rights of set-off or counterclaim and other rights with respect to such participation as fully as if such holder of a participation were a direct creditor of Guarantor pursuant to this Guaranty in the amount of such participation.

    **Savings Clause.** Notwithstanding anything to the contrary herein, the Guarantor's obligations hereunder shall not exceed the maximum amount that would not be subject to avoidance under fraudulent conveyance, fraudulent transfer, and other similar laws.

    **Governing Law.** The provisions of this Guaranty and the respective rights and duties of Guarantor and Lender hereunder shall be governed by and construed in accordance with Utah law and any applicable federal laws. Guarantor hereby irrevocably submits to the non-exclusive jurisdiction of any Utah state or federal court sitting in Salt Lake County, over any action or proceeding arising out of or relating to this Guaranty, or any document related to the Obligations, and Guarantor hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such Utah state or federal court. The Guarantor hereby waives any objection that it may now or hereafter have to the venue of any such suit or any such court or that such suit is brought in an inconvenient court.

Executed as of the date set forth above.

                                      Guarantor:
                                        **CAMELOT ENTERTAINMENT GROUP, INC.**

                                      BY:

                                        Robert P. Atwell, CEO

**EXHIBIT G**

## LOAN MODIFICATION AGREEMENT

THIS LOAN MODIFICATION AGREEMENT (this *"Modification Agreement"*) is made and entered into effective as of the 11th day of June 2010 (the *"Effective Date"*), by and among Incentive Capital, LLC (*"Lender"*), on the one hand; and Camelot Film Group, Inc. (*"Borrower"*), Camelot Distribution Group, Inc. (*"CDG"*), Camelot Entertainment Group, Inc. (*"CEG"*), and Robert P. Atwell ("Atwell", and together with CDG and CEG, collectively, the *"Guarantors"*), on the other hand. Lender, Borrower, and the Guarantors are sometimes hereinafter collectively referenced as the *"Parties"*, and individually referenced as a *"Party."* All capitalized terms used but not defined herein shall have the meanings assigned them in the Loan Documents. The following are not mere recitals but agreed-to terms:

## RECITALS

A.     On or about April 27, 2010, Lender agreed to make a loan (the *"Loan"*) to Borrower pursuant to a Promissory Note – Term Loan, dated April 27, 2010, in the stated principal amount of $650,000 (the *"Note"*).

B.     The Note is secured by, among other things, that certain Security and Participation Agreement dated April 27, 2010 (the *"Participation Agreement"*), under which Lender is entitled to receive "Secured Party Initial Revenue Participation" (as defined in the Participation Agreement) and "Final Secured Party Revenue Participation" (as defined in the Participation Agreement) (collectively, the *"Participation Payments"*) from Borrower.

C.     In order to induce Lender to make the Loan to Borrower, each of the Guarantors executed and delivered to Lender a Commercial Guaranty (collectively, the *"Guaranties"* and together with the Note, and the Participation Agreement, and all other related agreements executed by both Parties in connection with the Loan, (collectively, the *"Loan Documents"* as further defined in the Note) dated April 27, 2010, whereby in the Guaranties each of the Guarantors guaranteed the obligations of Borrower to Lender under the Loan.

D.     A disagreement has arisen between the Parties, wherein (i) Lender alleges a claim against Borrower and the Guarantors for the failure to meet certain financial/operational benchmarks and (ii) Borrower and the Guarantors deny such claims and allege a claim against Lender for the failure to make one or more advances under the Note (collectively the *"Dispute"*).

E.     The Parties desire to enter into this Loan Modification Agreement to address and resolve the Dispute and other matters set forth herein.

F.     Unless specifically and expressly modified herein, all remaining terms of the Loan Documents shall remain in full force and effect.

NOW, THEREFORE, in consideration of the mutual promises contained in this Modification Agreement and for other good and valuable consideration, including the forbearance by both Parties from instituting legal action, the receipt and sufficiency of the consideration is hereby acknowledged, the Parties hereby agree as follows:

## AGREEMENT

1.    <u>Resolution</u>.  Subject to the terms, conditions and understandings contained in this Modification Agreement, and for so long as there does not exist an "Event of Default" (as defined in the Note), each of the Parties hereby agrees to refrain and forbear from exercising and enforcing any of its remedies under the Loan Documents, or under applicable laws, with respect to the Dispute.  No Party shall have an obligation to refrain and forbear from exercising or enforcing any of its rights or remedies upon the occurrence of an "Event of Default" (as defined in the Note).

2.    <u>Modification</u>.  The Parties hereby agree to the following modified Loan terms and, to the extent necessary to give them effect, hereby modify the Loan Documents:

A.    By no later than April 27, 2011 (the "Deadline"), Borrower shall use its best efforts to generate sales from the exploitation of the "Liberation Assets" (as defined in the Loan Documents) in an amount not less than $2,284,500 (the *"Minimum Sales Target"*).

B.    In the event Borrower fails to meet the Minimum Sales Target by the Deadline, then interest shall accrue on the "Deficiency Amount" (defined as the difference between Borrower's actual Liberation Assets gross sales and the Minimum Sales Target) at the rate of 1.50% per month (the "*Shortfall Interest*"), commencing as of the Deadline. Borrower shall make monthly payments of all accrued but unpaid Shortfall Interest on the last day of each such month thereafter where there is accrued but unpaid Shortfall Interest, which payments shall be made in cash or the "Cash Equivalent Stock" of CEG's common tradeable stock, in Borrower's discretion.  Cash Equivalent Stock shall be valued at the point of sale and shall be the actual sale price of the stock.

C.    Notwithstanding anything to the contrary in the Participation Agreement, in each month as of the date hereof where "Camelot Revenue" (as defined in the Security and Participation Agreement) from Borrower's exploitation of the Liberation Assets is greater than $150,000 but less than $200,000 for that month, then in lieu of the Participation provided for in Paragraph 2 of the Participation Agreement. Borrower shall make Participation Payments to Lender equal to 13% of the Camelot Revenues.  In each such month where Camelot Revenues from Borrower's exploitation of the Liberation Assets are equal to or greater than $200,000 for that month, then in lieu of the payments provided for in Paragraph 2 of the Participation Agreement or in the above sentence, Borrower shall make Participation Payments to Lender equal to 15% of the Camelot Revenues.  Notwithstanding the foregoing increased Participation Payment percentages (collectively or separately the "*Increased Participation Amounts*"), once Borrower has made total Participation Payments to Lender in the amount of $375,000 in the aggregate during any one year period, commencing as of April 27, 2010, then on the next month after the month in which Lender has received total Participation Payments of $375,000, Lender shall only receive Participation Payments equal to 10% of Camelot's Revenues as set forth in the Security and Participation Agreement. If the payment of the Increased Participation Amounts in any given month for individual title(s) from the Liberation Assets would result in a net loss to Borrower for that month on such individual title(s) ("Net Loss Titles"), then the Increased Participation Amounts that Borrower shall pay to Lender shall be limited to the greater of 10% of the applicable Camelot Revenues for that month on such specific title(s) and the percentage of Camelot Revenues that would result in a break even for Borrower in net revenues for the month (*i.e.*, no net gain or loss for Borrower from Revenues for that month). For months where any

2

Increased Payment Amounts are due to Lender hereunder, Borrower is limited to counting no more than 35% of its individual titles as "Net Loss Titles," and Borrower shall pay such Increased Payment Amounts on at least 65% of its title(s) whether or not such titles are in fact Net Loss Titles.

3.    Default.  The occurrence of an "Event of Default" (as defined in the Note) shall be deemed to include an occurrence of any such Event in connection with this Modification Agreement (a "Modification Default"), and therefore, the failure of Borrower, or Lender, as the case may be, to observe, perform or comply with any of the terms, conditions or provisions of this Modification Agreement, shall be deemed a Modification Default and subject the defaulting Party to the remedies set forth below.

4.    Remedies.  Immediately upon the occurrence of any Modification Default, the obligations, agreements, and commitments of each of the Parties under this Modification Agreement to forbear from exercising its remedies against the other Parties granted in the Loan Documents, shall immediately and automatically terminate and be of no further force or effect, subject to the cure provision below. In the event of an alleged Modification Default by either Party, the other Party shall provide written notification of such alleged Modification Default and the alleged defaulting Party shall have thirty (30) days from the receipt of such notice to cure such alleged Default.  Notice of an Event of Default may be provided by email, but if it is emailed, it must also be accompanied by a notice sent *via* U.S. Mail or facsimile.  In the event that such defaulting Party does not cure such alleged Event of Default, then all remedies available under the Loan Documents shall be available to the applicable non-defaulting Party.

5.    Successors and Assigns.  This Modification Agreement shall be binding upon and inure to the benefit of Borrower, the Guarantors, Lender and each of their respective heirs, personal representatives, successors, and assigns.  Borrower shall not assign any of his rights or obligations under this Modification Agreement without the prior written consent of the Lender.

6.    Time of Essence.  Time is of the essence for this Modification Agreement.

7.    Counterparts.  This Modification Agreement may be executed in any number of duplicate originals or counterparts, each of which duplicate originals or counterparts shall be deemed to be an original and all taken together shall constitute but one and the same instrument.

8.    Severability.  In case one or more provisions contained in this Modification Agreement shall be invalid, illegal, or unenforceable in any respect under any law, the validity, legality and enforceability of the remaining provisions contained herein shall remain effective and binding and shall not be affected or impaired thereby.

9.    Amendments.  This Modification Agreement may be amended, modified, or supplemented only by written agreement of the Parties.  No provision of this Modification Agreement may be waived except in writing signed by the Party against whom such waiver is sought to be enforced.

10.    Continuing Enforceability.  Except as otherwise modified by this Modification Agreement, the Loan Documents shall remain in full force and effect, enforceable in accordance with all of their original terms and provisions.  This Modification Agreement shall not be

3

effective or binding unless and until it is fully executed and delivered by Lender, Borrower, and the Guarantors.

IN WITNESS WHEREOF, the Parties have executed this Loan Modification Agreement as of the Effective Date.

**LENDER:**

**Incentive Capital, LLC**

By: _____
Name: _____ James K. Merham
Title: _____ Manager

**Borrower:**                    Guarantors:                    **Camelot Entertainment Group, Inc.**

                                                                 By: _____
                                                                 Robert P. Atwell, President

**Camelot Film Group, Inc.**     **Camelot Distribution Group, Inc.**

By: _____
Robert P. Atwell, President
                                 By: _____         _____
                                 Robert P. Atwell, President          Robert P. Atwell, individually

4

**EXHIBIT  H**

## TRANSFER STATEMENT

The debtors, Camelot Distribution Group, Inc., Camelot Entertainment Group, Inc., and Camelot Film Group, Inc. (collectively, "Debtor"), defaulted under their loan obligations to the secured party, Incentive Capital, LLC (the "Secured Party"). As a result thereof, the Secured Party, pursuant to its Notice of Disposition of Collateral by Public Sale dated February 9, 2011, did conduct a public sale of the following personal property constituting a portion of Secured Party's collateral (the "Collateral"):

> All of Debtor's rights to the film library described herein below and referred to as the "Distribution Assets", along with all products and proceeds of or from (a) the Distribution Assets; and (b) all accounts, negotiable instruments, chattel paper and electronic chattel paper, general intangibles, proceeds, and monies derived from the disposition or other exploitation of the Distribution Assets in all media, from all sources, worldwide during the term hereof. The Distribution Assets include without limitation the following films, and all of Debtor's right, title and interest therein, including distribution rights, royalty interests, and contract/account payments: Samurai Avenger; First Strike; Screwball: The Ted Whitfield Story (aka The Wiffler); The Fallen; One Lucky Dog (aka Weiner Dog Nationals); Never Sleep Again; Hellraiser Unleashed; Fink!; Nude Nuns With Big Guns; Zombie Culture; National Lampoons Dirty Movie; Who Is KK Downey; and Next of Kin.

> All of Debtor's personal property assets and interests as more particularly described in the Asset Purchase Agreement (the "Asset Purchase Agreement") dated April 28, 2010 between Camelot Film Group, Inc., a Nevada corporation, on the one hand, and CMBG Advisors, Inc., a California corporation in its sole and limited capacity as assignee for the benefit of creditors of Liberation Group, Inc., on the other hand, and all products and proceeds thereof, including without limitation (a) that certain film library referred to as the Liberation Assets (as defined in the Asset Purchase Agreement); (b) all accounts, negotiable instruments, chattel paper and electronic chattel paper, general intangibles, proceeds, and monies derived from the disposition or other exploitation of the Liberation Assets in all media, from all sources, worldwide during the term hereof; and (c) other assets of the Debtor as set forth in the Asset Purchase Agreement.

The sale was held at 9:00 a.m. on February 21, 2011 at the Offices of Pia Anderson Dorius Reynard & Moss, 299 S. Main Street, Suite 1710, Salt Lake City, Utah.

The successful bidder at the sale was Incentive Capital, LLC, who did purchase all of the said Collateral for the price of $200,000.00. By this Transfer Statement, the undersigned attorney for the Secured Party hereby memorializes the transfer of all of Debtor's rights, title and interest in

and to the Collateral to Incentive Capital, LLC, with an address of 299 S. Main Street, Suite 1710, Salt Lake City, UT 84111. This transfer is being made "as-is" and "where-is" by the Secured Party without warranty, express or implied, relating to title, possession, quiet enjoyment, or the like in the foregoing described disposition.

DATED this 21st day of February 2011.

Nathan S. Dorius
Attorney for Secured Party

1

# **CERTIFICATE OF SERVICE**

2

3          Pursuant to FRCP 5, I certify that I am an employee of the law firm of WYMAN & ISAACS LLP,

4     and that on the date shown below, I caused service of a true and correct copy of the attached:

5     **NOTICE OF MOTION AND MOTION TO INTERVENE; MEMORANDUM OF POINTS AND**

6     **AUTHORITIES IN SUPPORT THEREOF**

7     to be completed by:

8     _____          personally delivering

9     _____          delivery via Nationwide Legal Services

10    _____          sending via Federal Express or other overnight delivery service

11    __X__          depositing for mailing in the U.S. mail with sufficient postage affixed thereto

      _____          delivery via facsimile machine to fax no. _____

12

13    _____          by E-Mail – PDF Format - I caused the foregoing document to be served by e-mail

14                     transmission, in PDF Format, to each of the interested parties at the e-mail address

15                     shown below.

16    _____          electronic filing, and thereby delivery via e-mail to:

17    Scott Hervey, Esq.
      Scott Plamondon, Esq.

18    Weintraub Genshlea Chediak
      400 Capital Mall

19    Suite 1100
      Sacramento, CA  95814

20    E-Mail:  shervey@weintraub.com
                splamondon@weintraub.com

21

22          Dated this 5th day of May, 2011

23

24                                    /s/ Lina Pearmain
                                      _____
                                      Lina Pearmain

25

26

27

28

1

CONFORM

1  Bruce Isaacs, Esq. (SB# 100926), bisaacs@wymanisaacs.com
   WYMAN & ISAACS LLP
2  5757 Wilshire Blvd., Suite 475
   Los Angeles, CA  90036
3  Tel: (323) 648-4141
   Fax: (323) 648-4133
4
5  Attorneys for Intervenor
   INCENTIVE CAPITAL, LLC
6

7

8              UNITED STATES DISTRICT COURT

9             CENTRAL DISTRICT OF CALIFORNIA

10

11 CAMELOT DISTRIBUTION GROUP, INC.,  )   Case No.: CV11-01949 DDP (FMOx)
                                      )
12              Plaintiff,            )
                                      )
13         vs.                        )   [PROPOSED] ORDER RE MOTION TO
                                      )   INTERVENE
14 DOES 1 through 5865, inclusive,    )
                                      )   Date:      June 13, 2011
15              Defendant.            )   Time:      10:00 a.m.
                                      )   Courtroom: "3"
16 _____)

17                                       (Filed Currently with Notice of Motion and
                                         Motion to Intervene; Memorandum of Points
18                                       and Authorities in Support Thereof;
                                         Declaration of Joseph G. Pia and [Proposed]
19                                       Complaint in Intervention for Copyright
                                         Infringement)
20

21

22

23

24

25

26

27

28

1        On June 13, 2011, Intervenor Incentive Capital, LLC ("Incentive") motion for intervention came

2    on for hearing before the Hon. Dean D. Pregerson, United States District Judge.  Bruce Isaacs of Wyman

3    & Isaacs LLP appeared on behalf of Incentive.  Scott Hervey and Scott Plamondon, attorney of record for

4    Camelot Distribution Group, Inc. ("Camelot"), appeared on behalf of Camelot.  The Court, having fully

5    considered all of the papers filed and oral argument, and all of the papers and pleadings on file in this

6    action, and for good cause appearing therefore:

7           **IT IS HEREBY ORDERED** that Incentive's motion for intervention is granted in its entirety.

8    The Court hereby finds as follows:

9         1.      Incentive has demonstrated sufficient grounds to permit Incentive to intervene as a

10             Plaintiff in this action.

11

12    **IT IS SO ORDERED.**

13

14

15    **DATED:** _____

16

17                            HONORABLE DEAN D. PREGERSON
                              UNITED STATES DISTRICT JUDGE

18

19    **Presented by:**

20      WYMAN & ISAACS LLP

21

22    By:_____ s/Bruce Isaacs_____
          Bruce Isaacs, Esq., No. 100926

23          Attorneys for Intervenor
          INCENTIVE CAPITAL, LLC

24          5757 Wilshire Blvd., Suite 475
          Los Angeles, CA  90036

25

26

27

28

**CERTIFICATE OF SERVICE**

Pursuant to FRCP 5, I certify that I am an employee of the law firm of WYMAN & ISAACS LLP, and that on the date shown below, I caused service of a true and correct copy of the attached:

**[PROPOSED] ORDER RE MOTION TO INTERVENE**

to be completed by:

_____       personally delivering

_____       delivery via Nationwide Legal Services

_____       sending via Federal Express or other overnight delivery service

\_\_X\_\_       depositing for mailing in the U.S. mail with sufficient postage affixed thereto

_____       delivery via facsimile machine to fax no. _____

_____       by E-Mail – PDF Format - I caused the foregoing document to be served by e-mail transmission, in PDF Format, to each of the interested parties at the e-mail address shown below.

_____       electronic filing, and thereby delivery via e-mail to:

Scott Hervey, Esq.
Scott Plamondon, Esq.
Weintraub Genshlea Chediak
400 Capital Mall
Suite 1100
Sacramento, CA  95814
E-Mail:  shervey@weintraub.com
            splamondon@weintraub.com

Dated this 5th day of May, 2011

/s/Lina Pearmain
Lina Pearmain

FILED CONFORM

1  Bruce Isaacs, Esq. (SB# 100926), bisaacs@wymanisaacs.com
2  WYMAN & ISAACS LLP
   5757 Wilshire Blvd., Suite 475
3  Los Angeles, CA 90036
   Tel: (323) 648-4141
4  Fax: (323) 648-4133

2011 MAY -5 PM 3:44

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY_____

5  Attorneys for Intervenor
6  INCENTIVE CAPITAL, LLC

7

8

9

10

11                  **UNITED STATES DISTRICT COURT**

12                 **CENTRAL DISTRICT OF CALIFORNIA**

13

14  CAMELOT DISTRIBUTION GROUP, INC.,  )   Case No.: CV11-01949 DDP (FMOx)
                                        )
15            Plaintiff,                )
                                        )
16        vs.                           )   **DECLARATION OF JOSEPH G. PIA;**
                                        )   **[PROPOSED] COMPLAINT IN**
17  DOES 1 through 5865, inclusive,     )   **INTERVENTION FOR COPYRIGHT**
                                        )   **INFRINGEMENT**
18            Defendant.                )
                                        )   Date:      June 13, 2011
19  _____)   Time:      10:00 a.m.
                                            Courtroom: "3"
20

21                                          (Filed Concurrently with Notice of Motion and
                                            Motion to Intervene; Memorandum of Points
22                                          and Authorities in Support Thereof; and
                                            [Proposed] Order)
23

24

25

26

27

28

_____
             DECLARATION OF JOSEPH G. PIA RE [PROPOSED] COMPLAINT IN INTERVENTION

## DECLARATION OF JOSEPH G. PIA

I JOSEPH G. PIA, hereby declare as follows:

1.      I am an individual over the age of 18, and have personal knowledge of the facts set forth herein.

2.      I am a partner in the law firm of Pia Anderson Dorius Reynard & Moss ("PADRM"), which is outside counsel in Utah to the Intervenor Incentive Capital, LLC ("Incentive Capital").

3.      Attached hereto as Ex. "1" is a true and correct copy of the proposed Complaint in Intervention for Copyright Infringement.

4.      On or about February 11, 2011, my law firm conducted a non-judicial foreclosure on behalf of our client, Incentive Capital, at which we foreclosed upon any and all distribution rights in and to the motion picture entitled *Nude Nuns with Big Guns* (the "Motion Picture").

5.      In the instant case (the "BitTorrent Case"), Camelot Distribution Group, Inc. ("Camelot") has filed a copyright infringement action against various Doe Defendants with respect to the Motion Picture.  In the BitTorrent Case, Incentive Capital has filed a motion to intervene and a complaint in intervention because Incentive Capital contends that it, not Camelot, is the owner of the distribution rights to the Motion Picture by virtue of the non-judicial foreclosure which took *before* the BitTorrent Case was filed.

6.      Incentive Capital contends that Camelot is not the owner of the distribution rights to the Motion Picture and, therefore, does not have standing to file, prosecute or prevail in the BitTorrent Case.  Rather, Incentive Capital, as the owner of the distribution rights to the Motion Picture, contends that it is the party with standing and the real party in interest who is entitled to file, prosecute and prevail in the BitTorrent Case.

7.      Case No. CV11-02323 GAF(JEMx) (the "Camelot Case") is a case between Camelot Entertainment, Inc., Camelot Film Group, Inc and Camelot Distribution Group, Inc. (the "Camelot Entities"), on the one hand, and Incentive Capital, on the other, with respect to money due and owing to Incentive Capital for the secured loans it made to the Camelot Entities to allow them to acquire a film library, a library which includes the Motion Picture.

8.     The same parties, the Camelot Entities and Incentive Capital, have a similar action pending in the Utah State Court which pertains to these same matters (payment due to Incentive Capital and ownership of the distribution rights of the motion pictures in the film library, including ownership of the distribution rights in and to the Motion Picture) and Incentive Capital has already filed a motion to dismiss the Camelot Case or transfer it to the Utah State Court.

9.     Incentive Capital's motion to dismiss/transfer is on calendar for June 6, 2011 before the Honorable Gary A. Feess.

10.     Attached to the memorandum of points and authorities as Exhibits "A" through "H" are true and correct copies of transactional documents by which Camelot initially licensed the distribution rights to the Motion Picture, by which Incentive Capital entered into the secured loan transactions with the Camelot Entities and by which Incentive Capital acquired the distribution rights to the Motion Picture.

11.     Incentive Capital's primary attorneys are based in Utah and my firm did not learn about the BitTorrent Case until a few days ago. Once we learned of the BitTorrent Case, we promptly filed this motion to intervene.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct.

Executed this 5th day of May, 2011, at Salt Lake City, Utah.


/s/ Joseph G. Pia
JOSEPH G. PIA

DECLARATION OF JOSEPH G. PIA RE [PROPOSED] COMPLAINT IN INTERVENTION
2

Legal Tabs Co. 1-800-322-3022

Recycled   Stock #EX-5-B

**EXHIBIT 1**

Bruce Isaacs, Esq. (SB# 100926), bisaacs@wymanisaacs.com
WYMAN & ISAACS LLP
5757 Wilshire Blvd., Suite 475
Los Angeles, CA  90036
Tel:  (323) 648-4141
Fax:  (323) 648-4133

Attorneys for Intervenor
INCENTIVE CAPITAL, LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| INCENTIVE CAPITAL, LLC, a Utah limited liability company<br><br>    Plaintiff,<br><br>vs.<br><br>DOES 1 through 5865, inclusive,<br><br>    Defendant. | Case No.:  CV11-01949 DDP (FMOx)<br><br>**COMPLAINT IN INTERVENTION FOR COPYRIGHT INFRINGEMENT** |

## **INTRODUCTION**

  Plaintiff Incentive Capital, LLC ("Plaintiff" or "Incentive") is the exclusive United States distributor of the motion picture titled *Nude Nuns with Big Guns* ("the Motion Picture").

  The Defendants, and each of them, engaged in the distribution of the Motion Picture via one or more peer-to-peer ("P2P") networks through the use of software which operated using the BitTorrent protocol.

  The Plaintiff is informed and believes that the BitTorrent protocol is a digital communications protocol capable of enabling users to distribute large files without placing a heavy load in the source

1   computer network.  Rather than downloading a file from a single source, the BitTorrent protocol allows

2   users to join a "swarm" comprised of multiple users hosting data on their personal computer to download

3   and upload data from each other simultaneously.  A user who wants to make a file available that is not

4   already on this type of P2P system will first create a small torrent descriptor file which is then distributed

5   by conventional means (web, email, etc.).  He or she then makes a complete copy of the file itself

6   available through a BitTorrent node.  This original complete copy is known as a seed.  Those who have

7   acquired the torrent descriptor file can give it to their own BitTorrent nodes which, acting as peers,

8   download it by connecting the seed and/or other peers.  The file is then distributed by dividing it into

9   segments called pieces.  As each peer receives a new piece of the file, that peer becomes a source of that

10  piece to the other peers, relieving the original seed from having to send a copy to every peer.

11        With BitTorrent, the task of distributing the file is shared by those who want it.  Using the

12  BitTorrent protocol, it is possible for the seed to send only a single copy of the file itself to an unlimited

13  number of peers.  When a peer completely downloads a file, it becomes an additional seed.   This

14  eventual shift from peers to seeders determines the overall "health" of the file (as determined by the

15  number of times a file is available in its complete form).  This distributed nature of BitTorrent leads to a

16  flood-like spreading of a file throughout peers.  As more peers join the swarm, the downloading speed

17  and the likelihood of a successful download increases.  Relative to standard Internet hosting, use of the

18  BitTorrent protocol provides a significant reduction in the original distributor's hardware and bandwidth

19  resource costs.  It also provides redundancy against system problems, reduces dependence on the original

20  distributor and provides a source for the file which is generally temporary and therefore harder to trace

21  than when provided by the enduring availability of a host in standard file distribution techniqhes.

22                        **THE PARTIES**

23        1.      Incentive is a limited liability company formed pursuant to the laws of Utah, with its

24  headquarters and primary place of business in Utah County, Utah.

25        2.      The true names of Defendants are unknown to the Plaintiff at this time. Each Defendant is

26  known to the Plaintiff only by the Internet Protocol ("IP") address assigned to that Defendant by his or

27  her Internet Service Provider on the date and at the time at which the infringing activity of each

28

---

INTERVENTION COMPLAINT

2

1   Defendant was observed.  The Plaintiff believes that information obtained in discovery will lead to the

2   identification of each Defendant's true name and permit the Plaintiff to amend this Complaint to state the

3   same.

4          3.     Joinder of each of these Defendants is a single action is appropriate because each

5   Defendant was contemporaneously engaged in a coordinated effort with the other Defendants to

6   reproduce and distribute Plaintiff's copyrighted works to each other and hundreds of third parties via

7   BitTorrent protocol.  Plaintiff's claims against the Defendants therefore present issues of law and fact

8   common to all Defendants and all right to relief sought against Defendants arises from the same series of

9   transactions or occurrences.

10   JURISDICTION AND VENUE

11          4.     Jurisdiction in the District Court is based upon 28 U.S.C. § 1331, federal question, in that

12   the action arises out of violations of the Copyright Act, 17 U.S.C. § 501 et. seq.

13          5.     Venue is proper in the Central District of California or the District Court of Utah pursuant

14   to 28 U.S.C. §§ 1391 and 1400, in that a substantial portion of the events giving rise to the dispute arose

15   in those districts, the harm was sustained in those districts, and at least one Defendant is found in those

16   districts.

17   Rights in Motion Picture

18          6.     Plaintiff is licensed with the exclusive right to distribute the Motion Picture in the United

19   States for any and all media platforms, including but not limited to theatrical, home video, television and

20   Internet.  Plaintiff obtained this exclusive right from the prior holder of the exclusive license – Camelot

21   Distribution Group, Inc. – through non-judicial foreclosure on or about February 11, 2011.

22          7.     Camelot Distribution Group, Inc. was licensed with the exclusive right to distribute the

23   Motion Picture in the United States for any and all media platforms, including but not limited to

24   theatrical, home video, television and Internet, and was granted that exclusive right from the producer of

25   the Motion Picture on or about September 22, 2009.

26          8.     The producer of the Motion Picture owns the copyright in the Motion Picture and filed a

27   copyright registration application to register the copyright in the Motion Picture on September 29, 2010.

28

INTERVENTION COMPLAINT
3

1  The producer previously registered the screen play for the Motion Picture on August 11, 2009 (Pau

2  003440659).

3       9.     The Plaintiff is informed and believes that each Defendant, without the permission or

4  consent of Plaintiff, made use of one or more P2P networks to download a copy of the Motion Picture

5  and distributed the Motion Picture to the general public, by making the Motion Picture available for

6  distribution to other users of the P2P network.

7       10.    The Plaintiff does not know the true identity of the Defendants.  The Plaintiff has

8  identified or will identify each Defendant by the IP address assigned to that Defendant by his or her

9  Internet Service Provider on the date and at the time at which the Defendant's infringing activity

10  occurred.

11       11.    The Defendants knew, or should have known, that they did not have the right to copy or

12  distribute the Motion Picture.

13  FIRST CLAIM FOR RELIEF

14  (Copyright Infringement, 17 U.S.C. § 501)

15  (Against All Defendants)

16       12.    Plaintiff re-alleges and incorporates herein by reference the allegations in paragraphs 1

17  through 11 above as if set forth in full.

18       13.    Plaintiff is the holder of the exclusive right to distribute the Motion Picture in the United

19  States in all media.

20       14.    Defendants, and each of them, infringed Plaintiff's distribution rights in and to the Motion

21  Picture through the conduct alleged herein, including, but not limited to, downloading a copy of the

22  Motion Picture without authorization from Plaintiff, and distributing copies of the Motion Picture by,

23  among other activities, making a copy of the Motion Picture available for others to download and further

24  distribute to other users, all without authorization from Plaintiff, in violation of 17 U.S.C. § 501.

25       15.    The infringement of Plaintiff's distribution right in the Motion Picture was willful and

26  intentional.  Each Defendant knew that they did not have the right to copy or distribute the Motion Picture

27  because they did not have the authorization from Plaintiff (or the producer) to do so.  The Motion Picture

28

INTERVENTION COMPLAINT

4

1    identifies and acknowledges the producer as the copyright owner, and the Defendants knew they did not

2    have the producer's (or Plaintiff's) authorization to distribute the Motion Picture. The Motion Picture

3    also contains a warning which informed each Defendant that copying the Motion Picture is unlawful.

4        16.    Defendants' infringing action have caused Plaintiff injury in the form of lost sales, lost

5    profits, and a reduction in market price for the Motion Picture because Defendants are making the illegal

6    P2P copies of the Motion Picture available for free. Plaintiff continues to be injured by this reduction in

7    market price, and it will take many years for the market to recover to the point where Plaintiff can charge

8    its customary, proper retail price, and in fact the market may never recover to that point. Defendants'

9    infringing actions therefore entitle Plaintiff to recover its actual damages and Defendants' profits in

10   accordance with 17 U.S.C. § 504. Plaintiff may, at its election, recover statutory damages in accordance

11   with 17 U.S.C. § 504(c).

12       17.    Defendants' infringing actions have caused, and continue to cause, irreparable injury to

13   Plaintiff's ability to distribute the Motion Picture by making the Motion Picture available for no charge

14   over various P2P online networks. Defendants' actions therefore entitle Plaintiff to temporary,

15   preliminary and permanent injunctive relief pursuant to 17 U.S.C. § 502.

16       18.    Defendants' infringing actions also entitle Plaintiff to recover its full costs in bringing this

17   action, including reasonable attorneys' fees pursuant to 17 U.S.C. § 505.

18       WHEREFORE, Plaintiff prays for judgment as set forth below.

19   **<u>PRAYER</u>**

20   AS TO THE FIRST CLAIM FOR RELIEF

21   (Copyright Infringement)

22   (Against All Defendants)

23       1.    For an order requiring Defendants, and each of them, to show cause, if any they have, why

24   they should not be enjoined as hereinafter set forth, during the pendency of this action, pursuant to 17

25   U.S.C. § 502;

26

27

28

1   2.  For a temporary restraining order, a preliminary injunction, and a permanent injunction, all

2 requiring Defendants, and each of them, and their respective officers, directors, agents, attorneys, servants

3 and employees, and all persons acting under, in concert with, or for them:

4    a.  to refrain from distributing or copying the Motion Picture without express, written

5  authorization from Plaintiff; and

6    b.  to turn over to Plaintiff or destroy all copies of the Motion Picture in their control

7 or possession;

8   3.  For actual damages and Defendants' profits pursuant to statute, 17 U.S.C. § 504;

9   4.  For statutory damages pursuant to 17 U.S.C. § 504;

10   5.  For costs of suit and Plaintiff's reasonable attorneys' fees according to statute, 17 U.S.C. §

11 505; and

12   6.  For such other and further relief as the Court may deem just and proper.

13

14 DATED this 5th day of May, 2011.   WYMAN & ISAACS LLP

15

16           By: /s/Bruce Isaacs, Esq.

17           Bruce Isaacs
            Attorneys for Intervenor Incentive Capital, LLC

18

19

20

21

22

23

24

25

26

27

28

INTERVENTION COMPLAINT

6

<u>**CERTIFICATE OF SERVICE**</u>

Pursuant to FRCP 5, I certify that I am an employee of the law firm of WYMAN & ISAACS LLP, and that on the date shown below, I caused service of a true and correct copy of the attached:

**COMPLAINT IN INTERVENTION FOR COPYRIGHT INFRINGEMENT**

to be completed by:

_____  personally delivering

_____  delivery via Nationwide Legal Services

_____  sending via Federal Express or other overnight delivery service

_____  depositing for mailing in the U.S. mail with sufficient postage affixed thereto

_____  delivery via facsimile machine to fax no. _____

_____  by E-Mail – PDF Format - I caused the foregoing document to be served by e-mail transmission, in PDF Format, to each of the interested parties at the e-mail address shown below.

__X__  electronic filing, and thereby delivery via e-mail to:

Scott Hervey, Esq.
Scott Plamondon, Esq.
Weintraub Genshlea Chediak
400 Capital Mall
Suite 1100
Sacramento, CA  95814
E-Mail:  shervey@weintraub.com
                splamondon@weintraub.com

Dated this 5th day of May, 2011

/s/Lina Pearmain
Lina Pearmain

## <u>CERTIFICATE OF SERVICE</u>

      Pursuant to FRCP 5, I certify that I am an employee of the law firm of WYMAN & ISAACS LLP, and that on the date shown below, I caused service of a true and correct copy of the attached:

**DECLARATION OF JOSEPH G. PIA; [PROPOSED] COMPLAINT IN INTERVENTION FOR COPYRIGHT INFRINGEMENT**

to be completed by:

_____     personally delivering

_____     delivery via Nationwide Legal Services

_____     sending via Federal Express or other overnight delivery service

  X      depositing for mailing in the U.S. mail with sufficient postage affixed thereto

_____     delivery via facsimile machine to fax no. _____

_____     by E-Mail – PDF Format - I caused the foregoing document to be served by e-mail transmission, in PDF Format, to each of the interested parties at the e-mail address shown below.

_____     electronic filing, and thereby delivery via e-mail to:

Scott Hervey, Esq.
Scott Plamondon, Esq.
Weintraub Genshlea Chediak
400 Capital Mall
Suite 1100
Sacramento, CA  95814
E-Mail:  shervey@weintraub.com
          splamondon@weintraub.com

    Dated this 5th day of May, 2011

                          /s/Lina Pearmain
                          Lina Pearmain